# UNITED STATES DISTRICT COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| AHNIAH SELENE,<br><br>            Plaintiff,<br><br>v.<br><br>PARKLANE MANAGEMENT COMPANY, LLC; PARKLANE IDANHA ASSOCIATES, LLC; IDANHA ASSOCIATES, LLC; KENNETH G. HOWELL; ABC HOWELL, LLC; RENTAL HOUSING, LLC,<br><br>            Defendants. | Case No. 1:24-cv-00070-REP<br><br>**MEMORANDUM DECISION AND ORDER RE: CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT (Dkts. 48 & 49); DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 50); PLAINTIFF'S MOTION TO SEEK PUNITIVE DAMAGES (Dkt. 47); DEFENDANTS' MOTION IN LIMINE (Dkt. 53)** |

Pending are five motions: (i) a Motion for Partial Summary Judgment by Plaintiff (Dkt. 48); (ii) a Motion for Partial Summary Judgment by Defendants Parklane Management Company, LLC, Idanha Associates, LLC, and Kenneth Howell (Dkt. 49); (iii) a Motion for Summary Judgment by Defendants Parklane Idanha Associates, LLC, ABC Howell, LLC, and Rental Housing, LLC (Dkt. 50); (iv) a Motion for Leave to Seek Punitive Damages by Plaintiff (Dkt. 47); and (v) a Motion *in Limine* by Defendants (Dkt. 53). Each motion is fully briefed. On May 20, 2026, the Court heard oral argument. Having reviewed the briefing and heard the parties' arguments, and otherwise being fully informed, the Court enters the following Memorandum Decision and Order.

## I.    BACKGROUND

### A.    Facts

This case involves the provision of rental housing to a disabled tenant in Boise, Idaho. Plaintiff is a handicapped man. Selene Depo. at 20:12-13 (Dkt. 48-5). He uses a wheelchair for

mobility, requires a specialized bed to safely sleep, and has a service dog. *Id.* at 24:5-25:16.

Plaintiff is low income and relies on the Housing Choice Voucher Program (the federal Section 8

housing assistance program) to subsidize his rent. Howell Dec. at ¶ 10 (Dkt. 52).

The Idanha is a historic six-story building located in downtown Boise, Idaho at 928 W.

Main Street. *Id.* at ¶ 3. Originally, it was a hotel. *Id.* In the 1970s, it was repurposed as an

apartment building; its 140 hotel rooms were renovated into 52 apartment units.

The Idanha is owned by Defendant Idanha Associates, LLC, but that entity does not

operate or manage it. *Id.* at ¶ 7. Rather, Defendant Parklane Management Company, LLC

manages the Idanha and many other properties, including the Hillcreek Apartments. *Id.*

Defendant Ken Howell is a member of both Idanha Associates and Parklane Management

Company, LLC. *Id.* at ¶ 2.[1]

Defendants Parklane Idanha Associates, LLC, ABC Howell, LLC, and Rental Housing,

LLC do not own, maintain, operate, or manage the Idanha. *Id.* at ¶ 8. Nor do they lease to, or

interact with, its tenants. *Id.*[2]

The main floor of the Idanha is several steps above street level. *Id.* at ¶ 6. An enclosed

wheelchair lift on the west side of the building transits tenants from the exterior street level

sidewalk on Main Street to the main floor interior. *Id.* The wheelchair lift was installed in

approximately 2000 to service handicapped tenants. *Id.* at ¶ 6. A single, enclosed elevator on the

main floor runs between the basement and sixth floor. *Id.* at ¶ 4. A freight lift runs between the

basement and street level. *Id.* at ¶ 5.

---

[1] Herein, Defendants Idanha Associates, LLC, Parklane Management Company, LLC, and Mr. Howell collectively are referred to as "the Parklane Defendants."

[2] Herein, Parklane Idanha Associates, LLC, ABC Howell, LLC, and Rental Housing, LLC collectively are referred to as "the Three Entity Defendants."

The freight lift is not intended for human passenger use.  Frey Depo. at 31-33 (Dkt. 54-2); Brumbaugh Depo. at 27-29 (Dkt. 54-1).  It consists of a flat platform, without any guardrails, that lifts approximately 12 feet on a single pulley.  Selene Depo. at 132:1-9 (Dkt. 48-5).  It is not regulated by the Idaho Division of Occupational and Professional Licenses ("IDOPL"), does not have a Certificate of Operation for passenger use, and is not inspected therefor.  Frey Depo. at 31-33 (Dkt. 54-2); Brumbaugh Depo. at 27-29 (Dkt. 54-1).  Further, the freight lift bears a sign that reads: "ABSOLUTELY NO RIDERS!!!! ///// FREIGHT ONLY."  Ertz. Dec. Ex. 8 at 4 (Dkt. 48-12).

In 2016, Plaintiff chose to live at the Idanha because of its iconic nature and likeness to a castle, as well as its downtown location.  Selene Depo. at 59:6-23 (Dkt. 48-5).  On September 22, 2016, he signed a one-year lease to rent Unit 209 on the second floor.  *Id.* at 59:3-4.[3]  Thereafter, on October 23, 2017, Plaintiff signed a lease to rent Unit 209 on a month-to-month basis.  Muller Dec. Ex. C. (Dkt. 51-3).  The lease automatically renewed each month so long as Plaintiff was compliant with its terms.  *Id.* at 6.  Paragraph 9 ("Limitation of Liability") of Plaintiff's lease agreement provides, in relevant part:

> The apartments at the [Idanha] are accessed by one elevator and stairs. There will be times when the elevator is out of service for maintenance and for repair leaving stairs as the only means of access. While management will try to minimize inconvenience to tenants as a result of no elevator service, tenant agrees that the interruption of elevator service is not a breach of this lease, that management has no liability and is not responsible for expenses incurred by tenant as a result thereof.

*Id.* at 5.

---

[3] Due to Plaintiff's use of a wheelchair, living in this unit required him to use both the wheelchair lift (to access the main floor) and the elevator (to access the second floor).

Plaintiff's rental payments were subsidized through the Housing Choice Voucher Program through the conduit of a Public Housing Agency ("PHA") – here, the Boise City/Ada County Housing Authorities ("BCACHA").  Howell Depo. at 17:4-18 (Dkt. 48-5).  As the PHA, the BCACHA executed a Housing Assistance Payments contract ("HAP contract") with Defendant Idanha Associates, LLC to pay a portion of Plaintiff's rent.  Ertz Dec. Ex. 2 (Dkt. 60-3).

When either the wheelchair lift or the elevator were not operational, Plaintiff had to rely on the help of Parklane Management employees – and provide them with up to 20 minutes' advance notice – to access his apartment.  Selene Dec. at ¶¶ 5-11.  When the wheelchair lift was not operational, Plaintiff had to use the freight lift to move between the street level and basement level (where he could access the elevator).  *Id.* at ¶¶ 5-7, 31.  When the elevator was not operational, Plaintiff relied on employees of Defendant Parklane to physically carry him and his wheelchair to access his apartment on the second floor.  *Id.* at ¶¶ 12-13.  Otherwise, Plaintiff could not access his apartment.  Selene Dec. at ¶¶ 6, 9, 12, 23, 30.

Between 2016 and 2019, during Plaintiff's tenancy at the Idanha, Plaintiff alleges that there were outages of the building's wheelchair lift and elevator.[4]  As a result of these alleged outages, on February 24, 2019, Plaintiff filed a lawsuit against the Defendants claiming violations of the Fair Housing Act.  *Selene v. Parklane Mgmt. Co., et al,* No. 1:19-cv-00069-CWD ("the 2019 lawsuit").

---

[4] Plaintiff alleges the following outages: (i) an April 2017 approximate month-long outage of the wheelchair lift; (ii) a May 2017 approximate month-long outage of the elevator; (iii) a November 2018 approximate 10-day outage of the elevator; and (iv) a May 2019 extended outage of the elevator.  *See* Pl.'s SOF at ¶ ¶ 15, 21, 24-25, 28 (Dkt. 48-1); Am. Compl. at ¶ ¶ 97-106 (Dkt. 42).  However, as set forth *infra* (Section II), the Court does not consider these alleged outages for purposes of resolving the instant motions.

On December 16, 2019, Plaintiff and Defendants entered into a Confidential Settlement Agreement and Release of All Claims (the "Settlement Agreement") that resolved the lawsuit. Sealed Ex. 1 (Dkt. 3). In exchange for Plaintiff releasing Defendants from all claims and liability and dismissing the lawsuit with prejudice, Defendants paid Plaintiff an upfront sum of money, and agreed to prospectively fund Plaintiff's transportation, food, and temporary lodging if he was unable to access his apartment due to lift outages. *Id.* at 1. In pertinent part, the Settlement Agreement provides:

> **Non-monetary.** Defendants agree to the following in the event of future service issues or malfunction of the interior elevator or the sidewalk lift at the Idanha:
>
>> [] In the event that Selene is unable to return to his apartment by 6:00 pm, Selene will be able to use the provided debit card with an amount of $250.00. Selene agrees to only spend the funds for transportation, food (excluding alcohol) and temporary lodging. Selene agrees that he is allowed only to spend a maximum of $250.00 on the foregoing. In the event that the elevator and lift issues are not resolved the following day, Selene's debit card will be reloaded upon Selene providing receipts to Parklane for expenditures for the previous day with an additional $250.00 for each day the elevator is out of service and Selene is unable to return to his apartment.

*Id.* at 3-4. Defendant Howell signed the Settlement Agreement on behalf of all Defendants. *Id.* at 9.

In 2019 and 2020, Northwest Elevators installed upgrades to the Idanha's elevator and modernized it. Howell Dec. at ¶ 38 (Dkt. 52). In June 2020, the elevator passed inspection by the IDOPL. Howell Decl. at ¶ 44 (Dkt. 52); Howell Second Decl. at ¶ 13 (Dkt. 59-4).

From 2020 through 2022, there were sporadic outages of the wheelchair lift and elevator. Selene Decl. at ¶ 34 (Dkt. 60-2). Apparently, none resulted in Plaintiff issuing a three-day

demand notice or invoking the Settlement Agreement's remedy of moving to a hotel at Defendants' cost. *See* Pl.'s SOF at ¶¶ 31-37 (Dkt. 48-1).

On January 1, 2023, the structural frame of the wheelchair lift broke and would not operate. Howell Dec. at ¶ 12 (Dkt. 52). Since its installation in 2000, this was the first and only time the structural frame of the wheelchair lift had broken. *Id.* As a result, BCACHA began abating its contribution to Plaintiff's rent payments to Defendant Parklane Management Company. *Id.* at ¶ 17.

At some point during January 2023, Northwest Elevators informed Defendants that the issue with the wheelchair lift was structural and that it did not perform structural repairs. Howell Depo. at 42:4-19. Northwest Elevators recommended replacing the lift and estimated that replacement would take six months. *Id.* Based on that information, Mr. Howell decided to repair, rather than replace, the wheelchair lift. *Id.* at 42:11-19.

On January 5, 2023, Plaintiff emailed Tisha Bonney (Defendant Parklane Management Company's Chief Financial Officer) and wrote:

> As I'm sure you are aware, the external wheelchair lift on the front of the Idanha is not functioning and has not been functioning since New Years.
>
> I have not made arrangements to find other accommodations as of yet because I have been very ill. I'm feeling slightly better now and need wheelchair accessibility as well as access to Medical Services.
>
> I have called the Hyatt and they have an accessible room available starting tomorrow and for the next week. I'm thinking of reserving that and having your staff help me move tomorrow afternoon.
>
> Do you have any information on what's wrong and when it can be repaired to save us this trouble?

Muller Dec. Ex. D (Dkt. 51-4).

The same day, on January 5, 2023, Ms. Bonney and Lio Frey (Parklane Management Company's Operations Manager) both responded to Plaintiff's email.  *Id.*  Believing at the time that the lift's motor had broken, they responded that their vendor would repair the motor and reinstall it the next day.  *Id.*  That did not happen.

While the wheelchair lift was broken in January 2023, Plaintiff contacted Parklane Management Company employees, who assisted him in using the freight lift to enter and exit the Idanha's main floor.  Frey Depo. at 73:14-76:4.

On January 10, 2023, Mr. Frey emailed Plaintiff and wrote:

> Ahniah, at this time, our vendor has let us know the lift is not reparable.  While this is frustrating news, we now need to look at what this news means.  Currently, we do not have a timeline for when we will have an operating lift again at the Idanha Building.  As we have previously experienced, the elevator being out of service for an extended period of time, it would most likely be in your best interest to transfer to another property as you have done previously.  I spent time today looking through our Apartment catalog and visiting our vacant units.  I have identified a unit at Parkhill Apartments that I feel would meet your needs.  I prefer to meet you on site to view the apartment and verify that it will indeed meet your needs.

Ertz Dec. Ex. 11 at 33-34 (Dkt. 48-15); *see also* Selene Depo. at 147:1-16 (Dkt. 48-5).

On January 11, 2023, Plaintiff became ill and requested immediate assistance from Parklane to seek medical attention.  Selene Depo. at 148:16-17 (Dkt. 48-5).  Mr. Frey assisted Plaintiff with leaving the building via the freight lift.  Muller Dec. Ex. E at 3 (Dkt 51-5).

On January 12, 2023, Plaintiff met Mr. Frey at the Parkhill Apartments in Boise.  *Id.* at 1. They viewed Apartment #104 on the first floor.  *Id.*  After the meeting, Mr. Frey emailed Plaintiff and wrote:

> Thanks for meeting me at Parkhill A104.  I just wanted to send out this email and sum everything up for those that weren't present... The apartment is going to work for you in the interim.  You stated Norco will be able to move your bed and oxygen concentrator as well.  How about you let us know when they are able to schedule those key items and we will base moving the other needed items to align with Norco?  You mentioned you were approved for a 2 bedroom and I wanted to bring it up as you would need to speak to Cohn.  He is on this email and can address those questions directly. Thanks again for working with us and I appreciate your understanding.

*Id.*

On January 13, 2023, Plaintiff responded by email.  Muller Dec. Ex. J at 4 (Dkt. 51-10). Plaintiff explained that he had measured his apartment at the Idanha, and the bedroom at the Parkhill Apartments was not large enough to accommodate his wheelchair and the movement of his health care providers.  *Id.*  Plaintiff invited Mr. Frey to measure his apartment at the Idanha "in the aid of finding another unit that would work."  *Id.*  He referenced his desire to possibly use a voucher for a two-bedroom unit at the Idanha in the future.  *Id.*

On January 16, 2023, Mr. Frey measured Plaintiff's apartment at the Idanha.  *Id.* at 2-3. Plaintiff's bedroom measured 11' by 11'6".  Muller Dec. Ex. N (Dkt. 51-14). That day, Mr. Frey emailed Colin Ward (Defendant Parklane Management Company's Leasing Manager) a diagram with the measurements of Plaintiff's apartment, and instructed him to make relocating Plaintiff a priority:

> You will need to find a comparable 1 BR unit in the Downtown area that meets his needs.  I have tried to get you to meet with him several times now . . . You will also need to verify with housing if he does have a 2 BR voucher, if so then find him a unit within his means whatever that is.  By comparable we mean one with comparable rent for that which he is currently in as this move will be temporary and the Idanha will be paying the difference.  By meeting his needs we mean it needs to be on the 1st level preferred and it will need to have doorways which he can maneuver through in order to access all rooms.  Also, make sure it meets his needs

8

> according to the requirements in the outline attached.  You will
> need to reach out to Ahniah and show him any apartment you feel
> will work for him.  This is a PRIORITY!

Muller Dec. Ex. J at 2 (Dkt. 51-10).

On January 17, 2023, Mr. Frey met with a representative of Kiwi's Welding and Repair. Howell Dec. Ex. B (Dkt. 52-2).  The representative stated that he could rebuild the wheelchair lift's platform and strengthen the channel steel.  *Id.*

On January 20, 2023, Mr. Ward offered to show Plaintiff an apartment at the Camel's Back apartment complex in Boise.  Muller Dec. Ex. J at 1 (Dkt 51-10).  The Camel's Back apartment measured 9'10" by 11'9", smaller than Plaintiff's apartment at the Idanha.  Muller Dec. Ex. H (Dkt. 51-8); Frey Depo. at 118:18-25 (Dkt. 51-15).  Mr. Ward showed Plaintiff the Camel's Back Apartment on January 23, 2023.  Muller Dec. Ex. F at 2 (Dkt. 51-6).

On January 30, 2023, Plaintiff emailed Ms. Bonney and declined the Camel's Back apartment.  *Id.* at 4.  Plaintiff requested the "reasonable accommodation" of another larger apartment to avoid invoking the Settlement Agreement remedy of going to a hotel:

> I appreciate Lio and Cohn trying to find a unit for me.
> Unfortunately, the units I saw we're [sic] not feasible because the
> bedrooms were not large enough to accommodate my disability.
> What I'm asking is a reasonable accommodation of a bedroom that
> is equal or larger than the one I'm currently renting in the ldanha.
> As you are aware, my current unit 209 is not ADA accessible
> therfore [sic] doorways and bathroom are not barriers given the
> nature of my disability.  I would appreciate it if you would
> accommodate my needs and would like to hear back from you
> within 3 days with reasonable options or I will be forced to
> relocate to a hotel per our agreement dated 5 June, 2020.

*Id.*

On January 31, 2023, Mr. Ward emailed Plaintiff in response and offered to show him apartments – "just outside of downtown" Boise – at the Homestead and Redwood Court apartments. *Id.* However, the meeting was delayed. *Id.* at 3.

On February 3, 2023, Mr. Ward emailed Plaintiff and advised that a part had come in and that the wheelchair lift might be fixed "in the next few days." *Id.* at 2. Accordingly, Mr. Ward wrote: "We are going to hold off on the transfer to see if the lift is functional after this repair. If it is, then the lift could be working as soon as next week, which would make a transfer moot." *Id.*

In response, that day, Plaintiff emailed Ms. Bonney and made his first unequivocal request to relocate to a hotel:

> I received word from Colin today stating that Lio says that lift might be working as soon as next week but that's not guaranteed. I am discouraged that you have removed the option of relocating to one of your units and I feel the best place for me now is at a hotel. I'm going to call around and find accommodations and let you know what I find, Ill [sic] get back to you with where I will relocate and moving date today.

*Id.*

Later that day, by email, Mr. Ward rejected Plaintiff's request to relocate to a hotel. *Id.* Mr. Ward explained that it was more reasonable, and less burdensome, to give Maintenance "a few more days" to make the repair before looking at other move-in ready apartments for Plaintiff. *Id.* When Plaintiff specifically referenced the Settlement Agreement remedy, Mr. Ward responded:

> We do not believe this clause is binding in this case as you are currently occupying your unit and we have provided means for you to enter and exit the building by calling maintenance to use the freight elevator. You are not unable to return to your unit, as that clause stipulates. Furthermore, we do not believe there has been a material change in condition that would warrant you moving to a

10

> hotel immediately.  The lift has not functioned for weeks, during which time you have been able to get in and out of the building by the arrangement we have provided with maintenance.  The only change has been one of progress, in which I informed you that we have a repaired part and are working to get the lift back in working order.  I have been informed by Lio that the repair should be finished in a few days, at which time we can assess the functionality of the lift. . . Should this repair prove ineffective, we have identified additional units that may fit your requirements and will be happy to show you those units so you can determine whether or not they will work for you.  At this time, Parklane Management will not be providing financial support for you moving to a hotel for the reasons stated above. Once the repair has been completed and the functionality of the lift has been assessed, we will communicate that information to you.

*Id.* at 1.

On February 6, 2023, counsel for Plaintiff emailed Mr. Ward and attached a three-day written notice and demand (made pursuant to Idaho Code §6-320) to repair the wheelchair lift. Muller Dec. Ex. K at 2 (Dkt. 51-11).  The three-day written notice and demand stated:

> **Wheel-chair Lift**; **The wheel-chair lift my client relies upon to ensure safe access to the Premises is nonfunctional**; and, Upon my investigation I understand that you have made certain promises and assurances to conduct repairs and corrections and to mitigate the damages and injuries resulting to my Client given the wheel-chair lift has ceased to function. Because my Client has relied upon your underperformed promises and assurances to their detriment, my Client has sustained, and continues to sustain, damages.  By this notice, we demand cure of the above-described conditions. **You have three (3) days to correct the conditions.**

Ertz Dec. Ex. 11 at 6-7 (Dkt. 48-15) (emphasis in original).

That day, Mr. Ward responded that Parklane was already in the process of repairing the wheelchair lift and excerpted his February 3, 2023 emails to Plaintiff describing the status of the repairs.  *Id.* at 4-5.  Later that day, counsel for Plaintiff replied:

> My client wishes to only move once as moving belongings and living accommodations is stressful and injurious to Ahniah. Can you get Ahniah a new unit that has 2 bedrooms, or a single

11

> bedroom of equal or greater size (that is necessary to accommodate Ahniah's disability-related medical equipment), or give the OK for Ahniah to use the debit card for a hotel at Parklane's cost that likewise accommodates the equipment - and only a single move - during the pendency of your efforts to find a fix as is my client's right under agreement between Parklane and Ahniah? This is also a Reasonable Accommodation request made pursuant to 42USC3604(f).

*Id.* at 4.

By February 9, 2023 (three days after Plaintiff's three-day demand was made), Defendants had not made the repairs to the wheelchair lift.  On February 10, 2023, Mr. Ward emailed counsel for Plaintiff and offered Plaintiff a two-bedroom apartment at the Hillcreek Apartments in Boise.  Muller Dec. Ex. L at 3 (Dkt. 51-12).  Mr. Ward wrote:

> I've received another update on the state of repairs on the lift.  Its [sic] looking like it may be another week as we are working to repair and refit pieces of the lift.  I understand that is a continued inconvenience for your client.  I believe we have found a permanent solution to the situation.  You and Aniah have both stated that he has a two bedroom voucher that he would like to use on a new apartment up at Hill Creek. We do have a two bedroom unit at Hill Creek that we believe will meet Aniah's specifications. One bedroom is 10'4 x 11'6 and the other is 10'4 x 12'.

*Id.*  A number of emails followed, wherein counsel for Plaintiff and Mr. Ward debated the characterization of the transfer to the Hillcreek apartments as a "permanent solution."  *Id.*

On February 13, 2023, counsel for Plaintiff emailed Mr. Ward and declined a permanent move to the Hillcreek Apartments and requested a move to a hotel pursuant to the Settlement Agreement.  *Id.* at 2.  He wrote:

> My client will not agree to a permanent move at this time. Parklane is in violation of its agreement and in violation of the Fair Housing Act.  My client is sustaining significant damages.  You need to mitigate the damages that are accruing.  Give the OK for Ahniah to stay in a hotel and resupply the balance on the account of the card on a daily basis immediately, and until you have fixed

the wheelchair lift; he does not have the money to cover the cost on his own.

*Id.* That day, Mr. Ward responded by email. *Id.* at 1-2. He refused the move to a hotel, citing a lack of a material change of Plaintiff's condition given that Plaintiff had been using the freight lift for ingress and egress and had declined an ADA-compliant unit at the Camel's Back Apartments. *Id.*

On February 27, 2023, Mr. Ward emailed counsel for Plaintiff and notified him that the repair to the wheelchair lift was ongoing, but could be delayed until March 31, due to a part that was in delivery. *Id.* at 1. Mr. Ward again offered the Camel's Back Apartment or to continue the current arrangement of using the freight lift. *Id.* That day, counsel for Plaintiff responded, rejecting the use of the freight lift as unacceptable and again requesting that Plaintiff move to a hotel pursuant to the Settlement Agreement. Ertz Dec. Ex. 11 at 9 (Dkt. 48-15).

The next day, on February 28, 2023, Mr. Ward emailed counsel for Plaintiff and reiterated the offer of the Hillcreek two-bedroom apartment, Unit 101. *Id.* at 10-11. As a two-bedroom unit, the Hillcreek apartment was larger than Plaintiff's one-bedroom apartment at the Idanha. Plaintiff agreed to move into the Hillcreek apartment.

On March 3, 2023, Plaintiff was provided with keys to the Hillcreek apartment; on March 6, 2023, the majority of his belongings were moved into the apartment. *Id.* at 23. Sometime during March, Plaintiff moved into the apartment. Selene Depo. at 120:15-25 (Dkt. 51-1).[5]

On or about March 3, 2023, the main elevator at the Idanha stopped working. That day, counsel for Plaintiff emailed Mr. Ward a written notice and demand to repair the elevator. Ertz

---

[5] The Court takes judicial notice that the Hillcreek Apartments are located 1.9 miles north of the Idanha, just outside of downtown Boise. *See* Fed. R. Evid. 201.

13

Dec. Ex. 11 at 21-22 (Dkt. 48-15).  The elevator was repaired the same day.  Howell Dec. at ¶ 40 (Dkt. 52).

Prior to and following Plaintiff's move, representatives of the BCACHA corresponded with Defendants to monitor the repairs to the wheelchair lift and elevator to ensure that the premises complied with the Healthy, Quality, and Safety ("HQS") standards set forth in Defendants' HAP contract.  Pl.'s SOF at ¶ 61.  In this correspondence, BCACHA took the position that it had the right to inspect the unit and premises and approve that they complied with HQS before Plaintiff could move back into the Idanha.  Ertz Dec. Ex. 11 at 41-42 (Dkt. 48-15); Howell Dec. Ex. G at 15-19 (Dkt. 52-7).

In May 2023, the repair to the wheelchair lift was completed.  Howell Dec. at ¶ 21 (Dkt. 52).  On June 1, 2023, Northwest Elevators inspected the lift and provided a report to Parklane that found that the lift was operational.  Muller Dec. Ex. P at 3-4 (Dkt. 51-16); Frey Depo. at 86:17-87:9 (Dkt. 51-15).  In all, the repair of the wheelchair lift took approximately five months.  Frey Depo. at 85:15 (Dkt. 51-15).

On June 16, 2023, Mr. Frey emailed representatives of BCACHA a copy of a certificate of inspection from Northwest Elevators which stated that the wheelchair lift "passed inspection and is operational."  Howell Dec. Ex. G at 26-27 (Dkt. 52-7).  On June 28, 2023, Mr. Frey emailed representatives of BCACHA and stated:

> I just want to circle back to this topic as we have completed all tasks required regarding the lift as it has passed inspection and met all requirements.  I want to verify all housing payments have resumed and are being made as of June 1st, or backdated as needed, and all inspections are to resume without failure regarding the lift.  I want to further verify all requirements are met and we will be moving Ahniah Selene back into his Idanha Apt #209 next week as housing has resumed payments for reasons listed above.

*Id.* at 23.

However, on June 29, 2023, based on an independent inquiry and inspection, BCACHA disagreed that the repairs to the wheelchair lift were sufficient. *Id.* at 22. This set off a dispute between Defendants and BCACHA over the scope of BCACHA's authority and the sufficiency of the repairs to the wheelchair lift. Howell Dec. at ¶¶ 21-25 (Dkt. 52). BCACHA took the position that the wheelchair lift needed to be replaced; Defendants took the position that the wheelchair lift was operational and safe with the existing repair. *Id.* at ¶ 29. The dispute lasted until December 2024. *Id.* at ¶¶ 29, 35. During this dispute, Plaintiff remained a resident of Hillcreek Apartments.

In July 2024, Nationwide Lifts inspected the wheelchair lift; in August 2024, it provided an opinion letter that the lift was operational and met applicable ADA standards. Howell Dec. Ex. K (Dkt. 52-11). On August 6, 2025, the wheelchair lift passed the IDOPL's 5-year inspection. Howell Dec. Ex. N (Dkt. 52-14).

On March 12, 2025, the IDOPL conducted a five-year inspection of the main elevator at the Idanha. Howell Dec. at ¶ 41 (Dkt. 52). IDOPL found that wires to the elevator improperly had been "jumped" or bypassed; more specifically, IDOPL found that "final terminal stopping devices have been removed." Ertz Dec. Ex. 3 at 25-26 (Dkt. 48-7). On March 17, 2025, IDOPL notified Parklane Defendants of the finding. Howell Dec. at ¶ 42 (Dkt. 52). On March 28, 2025, IDOPL granted Defendants a 60-day extension of deadline to repair the elevator. *Id.* at ¶ 43 (Dkt. 52).

On March 31, 2025, counsel for Plaintiff emailed Mr. Ward a written notice and demand to repair the elevator. *Id.* at ¶ 45.

In May 2025, Plaintiff notified Defendants that he planned to terminate his lease at the Idanha, leave the Hillcreek apartment, and move into a new apartment. *Id.* at ¶ 47. Plaintiff

requested that Defendants move his personal belongings from both the Idanha and Hillcreek apartments to his new residence and provide him additional time to move without charging a fee. Howell Dec. at ¶ 48 (Dkt. 52); Muller Dec. at ¶ 10 (Dkt. 51). Defendants agreed to move Plaintiff's furniture and belongings from his second-floor Idanha apartment to street level, and to provide him three additional days to complete his move. Howell Dec. at ¶ 49 (Dkt. 52).

By July 2025, Young Elevators had completed its repair of the elevator. On July 17, 2025, IDOPL issued a temporary certificate of operation for the elevator. *Id.* at ¶ 50. On August 19, 2025, IDOPL issued a 5-year Certificate to Operate the elevator. Howell Dec. Ex. P (Dkt. 52).

**B.    Procedural History**

On February 6, 2024, Plaintiff filed his initial Complaint. (Dkt. 1). On August 18, 2025, he filed his Amended Complaint. (Dkt. 42, hereinafter "Am. Compl."). Therein, Plaintiff asserted six causes of action: (i) Claim 1: discrimination on the basis of disability in violation of the Fair Housing Act ("FHA"), (ii) Claim 2: interference with the exercise of Plaintiff's rights under the FHA, (iii) Claim 3: violation of Idaho Code Section 6-320, (iv) Claim 4: breach of contract, (v) Claim 5: deceptive trade practices under the Idaho Consumer Protection Act ("ICPA"), and (vi) Claim 6: negligence. *See* Am. Compl. at ¶¶ 225-91. Plaintiff's case proceeded through discovery and an unsuccessful judicial settlement conference. (Dkt. 30).

Now before the Court now are the parties' cross-motions for partial summary judgment and summary judgment, and two associated motions. Plaintiff moves for partial summary judgment as to liability as to Claims 1, 2, 4 and 5.[6] *See* Pl.'s Mem. in Sup. of MPSJ at 2 (Dkt. 48-2). Three Defendants – Parklane Management Company, LLC, Idanha Associates, LLC, and

---

[6] The Court uses the term "Claim," whereas Plaintiff's Amended Complaint uses the term "Cause of Action."

Kenneth Howell (the "Parklane Defendants") – move for partial summary judgment as to Claims 1, 2, 3, 5 and 6. *See* Parklane Defs.' Mem. in Sup. of MPSJ at 4 (Dkt. 49-1). The remaining three defendants – Parklane Idanha Associates, LLC, ABC Howell, LLC, and Rental Housing, LLC (the "Three Entity Defendants") – move for summary judgment on all claims asserted against them: Claims 1, 2, 4, 5, and 6. *See* Three Entity Defs.' MSJ at 2 (Dkt. 50). Additionally, Plaintiff moves for leave to seek punitive damages. *See* Pl.'s Mot. for Punitive Damages at 2 (Dkt. 47-1); Pl.'s Reply at 2 (Dkt. 63). Finally, all Defendants move *in limine* to exclude two categories of evidence at trial and seek a pretrial ruling thereupon. *See* Defs.' Mem. in Sup. of Mot. *in Limine* (Dkt. 53-1).

The Court addresses the motions as follows: (i) Defendants' Motion *in Limine;* (ii) Plaintiff's and Parklane Defendants' Cross-Motions for Partial Summary Judgment; (iii) Three Entity Defendants' Motion for Summary Judgment; and (iv) Plaintiff's Motion for Punitive Damages.

## II.    DEFENDANTS' MOTION *IN LIMINE*

Defendants move the Court *in limine* to exclude two categories of evidence at trial: "(a) communications and dealings that Boise City/Ada County Housing Authority ("BCACHA") had with Defendants and (b) testimony and documents that predate Plaintiff's settlement with Defendants in December 2019 related to the Idanha lift and elevator." Defs.' Mot. *in Limine* at 2 (Dkt. 53). Defendants generally argue that such evidence is irrelevant under Federal Rule of Evidence ("FRE") 402; is confusing, misleading, and would waste time under FRE 403; is improper expert testimony under FRE 702; and in the case of evidence predating the Settlement Agreement, is judicially estopped. *See* Defs.' Mem. in Sup. of Mot. *in Limine* (Dkt. 53-1).

17

Plaintiff responds that the testimony of Deanna Watson, the Executive Director of BCACHA, both as a lay witness (she monitored elevator and wheelchair lift repairs in real time) and as a noticed expert witness (she has specialized knowledge about the HAP contract) is relevant and admissible. *See* Pl. Resp. to Defs.' Mot. *in Limine* at 4-12 (Dkt. 61). Moreover, Plaintiff argues that his instant claims allege violations that post-date the 2019 Settlement Agreement (and thus are not claim-precluded), and evidence of Defendants' prior, similar conduct (predating the 2019 Settlement Agreement) is probative of the instant claims. *Id.* at 12-14.

## A.    Legal Standards

Motions *in limine* are a procedural mechanism used to limit testimony or evidence in advance of trial. Their primary function is to "exclude prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 (1984). Rulings on motions *in limine* are inherently provisional and remain subject to revision as the trial unfolds. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000). Whether to grant a motion *in limine* falls squarely within the Court's discretion. *Luce*, 469 U.S. at 41 n.4 (1984).

Judicial estoppel is an equitable doctrine intended to protect the integrity of the judicial process by precluding a party from gaining an advantage by taking inconsistent positions in different judicial proceedings. *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (citation omitted). Generally, the doctrine applies if (i) the party's later position is "clearly inconsistent" with its earlier position; (ii) a court has accepted the party's earlier

18

position; and (iii) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750.

Where a party does not contest the validity of a contract and the benefits received, that party is judicially estopped from taking inconsistent positions that would negate the validity and enforceability of the contract. *Carter Dental, P.A. v. Carter*, 174 Idaho 131, 140 (2024) (holding that a party was judicially estopped from maintaining the benefits of the final judgment dismissing the case with prejudice, while simultaneously arguing that significant portions of a settlement agreement were unenforceable).

A release is a type of contract in which one party makes a "complete abandonment of a cause of action." *Lomas & Nettleton Co. v. Tiger Enters., Inc.*, 99 Idaho 539, 542 (1978). A settlement agreement "supersedes and extinguishes all pre-existing claims the parties intended to settle." *Estate of Holland v. Metro. Prop. & Cas. Ins. Co.*, 153 Idaho 94, 100 (2012) (quoting *Vanderford Co. v. Knudson*, 150 Idaho 664, 670 (2011)); *see also Young Elec. Sign Co. v. State ex rel. Winder*, 135 Idaho 804, 808 (2004) ("A compromise to settle a dispute, when validly entered into, supersedes all prior claims and defenses."). "The compromise agreement becomes the sole source and measure of the rights of the parties involved in the previously existing controversy. The existence of a valid agreement of compromise and settlement is a complete defense to an action based upon the original claim." *Wilson v. Bogert*, 81 Idaho 535, 542 (1959) (citations omitted).

**B.**    **Analysis**

Absent clear prejudice, the Court typically reserves ruling on motions *in limine* until trial. That is because pretrial *in limine* motions rulings are inherently provisional and often are subject to change as the evidence develops at trial. *See Ohler*, 529 U.S. at 758 n.3. Until the evidence

comes in at trial, the Court is not in the best position to evaluate the relevance and admissibility of the challenged evidence in context. *See Luce,* 469 U.S. at 41 n.4 (1984). Accordingly, here, the Court exercises its discretion to defer ruling on Defendants' Motion insofar as it requests a pretrial ruling on the admissibility of the testimony of Ms. Watson and related communications.

However, as it relates to pre-2019 evidence, Defendants' Motion goes further than a garden variety motion *in limine* to exclude trial evidence based on relevance and admissibility. It raises the equitable doctrine of judicial estoppel to exclude pre-2019 evidence. Because the requested equitable remedy bears on the Court's consideration of the instant cross-motions for partial summary judgment – rather than just trial evidence – the Court addresses that argument now.

Defendants argue that Plaintiffs should be estopped from presenting evidence of Defendants' alleged disability discrimination that was the subject of the 2019 lawsuit and resolved by the Settlement Agreement. The 2019 Settlement Agreement is a contract between Plaintiff and all Defendants. Sealed Ex. 1 at 1 (Dkt. 3). It contains a General Release that provides:

> Releasor [Plaintiff] agrees to release Releasees [Defendants] from all claims, liability, demands, suits, damages and judgments of every kind, known or unknown, in law or in equity, which Releasor now has or may have in the future in any way arising out of, relating to, or resulting from, whether directly or indirectly, the Alleged Violations that are the subject of the Lawsuit in exchange for the monetary and non-monetary consideration set forth below.

*Id.* Neither party contests the validity of the Settlement Agreement. It was accepted by the district court and resulted in the dismissal with prejudice of the 2019 lawsuit.[7] *New Hampshire,* 532 U.S. at 750.

---

[7] *See Selene v. Parklane Mgmt. Co., et al,* No. 1:19-cv-00069-CWD (Dkts. 32-34).

The General Release in the Settlement Agreement effects Plaintiff's complete abandonment of all claims against Defendants set forth in the First Amended Complaint in the 2019 lawsuit.[8] *Lomas & Nettleton Co.*, 99 Idaho 539 at 542.  This includes claims therein related to the following alleged outages: the April 2016 wheelchair lift outage, May 2017 elevator outage, November 2018 elevator outage, and other outages in 2019.  *Id.* at 7-17 (Dkt. 26).

Notwithstanding, Plaintiff raises the same facts related to those outages in this lawsuit as bases for its claims against Defendant.  *See* Am. Compl. at ¶¶ 25-120 (Dkt. 42).  Moreover, Plaintiff alleges that Defendants' violation of the Settlement Agreement *itself* is a basis for its FDA discrimination, breach of contract, and ICPA claims.  *See id.* at Claims 1, 4 & 5.  As such, Plaintiff's position in the instant lawsuit is "clearly inconsistent" with the General Release in the Settlement Agreement.  *New Hampshire,* 532 U.S. at 750.  And forcing Defendants to relitigate, in the instant lawsuit, facts underlying claims they settled in the 2019 lawsuit imposes an "unfair detriment" on them.  *Id.*

Accordingly, the Court holds that the equitable doctrine of judicial estoppel prevents Plaintiff from basing claims in the instant lawsuit on facts that were pled in the 2019 lawsuit and resolved by the Settlement Agreement and the General Release therein.  *See Carter Dental, P.A.*, 174 Idaho at 140.  Simply put, requiring Defendants to relitigate facts underlying the abandoned claims would be tantamount to claiming that the Settlement Agreement is invalid, a position Plaintiff cannot take if he wishes to pursue Claims 1, 4 and 5.  Thus, the Court will not consider the facts predating the 2019 Settlement Agreement in resolving the parties' instant cross-motions

---

[8] *See Selene v. Parklane Mgmt. Co., et al,* No. 1:19-cv-00069-CWD, Am. Compl. (Dkt. 26).

for summary judgment and Plaintiff's motion for punitive damages, *infra*.[9]  Nor will such facts be admissible at trial.

### III.    CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Plaintiff moves for partial summary judgment as to liability on four of his claims: (i) Claim 1 (discrimination under the FHA); (ii) Claim 2 (interference under the FHA); (iii) Claim 4 (breach of contract); and (iv) Claim 5 (violation of the ICPA).  *See* Pl.'s Mem. in Sup. of MPSJ at 2 (Dkt. 48-2).

Parklane Defendants move for partial summary judgment on five of Plaintiff's claims: (i) Claim 1 (discrimination under the FHA); (ii) Claim 2 (interference under the FHA); (iii) Claim 3 (violation of Idaho Code § 6-320); (iv) Claim 5 (violation of the ICPA); and (v) Claim 6 (negligence). *See* Parklane Defs.' Mem. in Sup. of MPSJ at 4 (Dkt. 49-1).

In the interests of judicial economy, the Court address the competing motions for partial summary judgment together on a claim-by-claim basis.

### A.    <u>Summary Judgment Standards</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In this regard, the court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted).  In considering a motion for summary judgment, courts must "view[] the facts in the non-moving party's favor." *Id.*

---

[9] To be clear, the Court does not find claim preclusion as to any of Plaintiff's instant claims, as Plaintiff argues.  *See* Pl. Resp. to Defs.' Mot. *in Limine* at 12-14 (Dkt. 61).  Rather, the Court simply estops Plaintiff from supporting those claims with facts pled in the 2019 lawsuit and resolved by the Settlement Agreement.

Summary judgment is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the movant does not bear the burden of proof at trial, the movant may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

The standard applicable to motions for summary judgment does not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.*, 930 F. Sup. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## B.    Claim 1: FHA Discrimination

Both Plaintiff and Parklane Defendants move for summary judgment on Claim 1. As to Claim 1, Plaintiff argues that he is entitled to partial summary judgment because there is no genuine dispute of material fact that Defendants discriminated against him because of his disability when they denied him the reasonable accommodation he requested – a hotel room at Defendants' cost as set forth in the 2019 Settlement Agreement – when wheelchair lift and elevator outages occurred. *See* Pl.'s MPSJ at 10-13 (Dkt. 48-2).[10]

Parklane Defendants argue they are entitled to summary judgment on Claim 1 because there is no admissible evidence of disparate treatment of Plaintiff, disparate impact to Plaintiff,

---

[10] Plaintiff frames his motion for partial summary judgment as to Claims 1 and 2 as follows: "Although Plaintiff maintains additional theories for recovery under the Fair Housing Act for which facts are likely contested, Plaintiff seeks partial summary judgment as to liability for two (2) discrete theories on the instant motion—namely, its failure to make reasonable accommodations [Claim 1] and its interference with Ahniah's exercise of rights under § 3604 [Claim 2]." *Id.* at 10. Thus, the Court construes that Plaintiff seeks summary judgment as to Claim 1 only on a reasonable accommodation theory.

23

or failure of Parklane Defendants to reasonably accommodate Plaintiff. *See generally* Parklane Defs.' Mem. in Sup. of MPSJ (Dkt. 49-1). Specifically, Parklane Defendants argue that there is no admissible record evidence that their one-time decision to repair, rather than replace, the wheelchair lift was made with discriminatory intent. *Id.* at 4-6. Further, they contend that there is no admissible record evidence that their one-time decision to repair, rather than replace, the wheelchair lift amounted to a policy or ongoing practice that caused disparate impact. *Id.* at 6-8. Likewise, they argue that isolated repairs to the elevator, absent a recommendation to replace it, did not amount to a policy or ongoing practice that caused disparate impact. *Id.* at 8-9. Finally, Parklane Defendants argue that there is no record evidence that they failed to reasonably accommodate Plaintiff when the wheelchair lift broke. *Id.* at 9-17. Rather, they claim they provided Plaintiff with *a* reasonable accommodation (an alternative and larger apartment at no additional cost), not *the* reasonable accommodation he requested (a hotel). *Id.*

### 1. **Legal Standard**

The FHA prohibits discrimination in the sale or rental of housing. 42 U.S.C. § 3604(f)(1). It also prohibits discrimination in the terms and conditions of housing, as well as in the provision of housing services or facilities. *Id.* at § 3604(f)(2). Discrimination under the FHA includes the failure to deny reasonable accommodations in the provision of housing, where those accommodations are necessary to a protected person's right to use and enjoy a dwelling. *Id.* at § 3604(f)(3)(B). A plaintiff may prove a discrimination claim under the FHA using one of three theories: disparate treatment, disparate impact, or a failure to provide reasonable accommodations. *Budnick v. Town of Carefree*, 518 F.3d 1109, 1113-14 (9th Cir. 2008).

To prove discrimination under a disparate treatment theory, a plaintiff must show the defendant acted intentionally with discriminatory intent or motive. *Tex. Dep't of Hous. &*

*Community Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015).  In the Ninth

Circuit, there are multiple ways to show that intent.  *Ohio House, LLC v. City of Costa Mesa*,

135 F.4th 645, 661-62 (9th Cir. 2025).  Relevant here, a plaintiff may prove disparate treatment

through a policy that, on its face, applies less favorably to a protected group.  *Cmty. House, Inc.*

*v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007).  However, where a plaintiff can point to

such a policy, a defendant can defeat the plaintiff's prima facie case by showing that the policy

either benefits the protected class or responds to legitimate safety concerns.  *Id.* at 1050.  Absent

such a policy, a plaintiff may show disparate treatment with "direct or circumstantial evidence

demonstrating that a discriminatory reason more likely than not motivated the defendant and that

the defendant's actions adversely affected the plaintiff in some way."  *Pac. Shores Props., LLC v.*

*City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013).

 "To establish a prima facie case of disparate impact, 'a plaintiff must show at least that

the defendant's actions had a discriminatory effect.'"  *Comm. Concerning Cmty. Improvement v.*

*City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009) (quoting *Keith v. Volpe*, 858 F.2d 467, 482

(9th Cir. 1988)).  This requires proof of (i) the existence of a policy that is outwardly neutral, (ii)

a significant, adverse, and disproportionate effect on a protected class, and (iii) robust causality

that shows that the challenged policy, and not some other factor or policy, caused the

disproportionate effect.  *S.W. Fair Hous. Council, Inc. v. Maricopa Domestic Water*

*Improvement Dist.*, 17 F.4th 950, 962 (9th Cir. 2021).  A one-time decision may not be sufficient

for a plaintiff attempting to establish the prima facie case of disparate impact.  *See Tex. Dep't of*

*Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 540 (2015) (noting that "a

plaintiff challenging the decision of a private developer to construct a new building in one

location rather than another will not easily be able to show this is a policy causing a disparate

impact because such a one-time decision may not be a policy at all."). Once the plaintiff establishes the prima facie case, the burden shifts to the defendant to show "(1) a legitimate business interest, and (2) that the practice or policy serves in a significant way that legitimate interest." *Maricopa Water,* 17 F.4th at 966-67.

To prove discrimination under a reasonable accommodation theory, a plaintiff must show that: (i) he suffers a "handicap" as defined by the FHA; (ii) defendants knew or should have known of plaintiff's handicap; (iii) the accommodation may be necessary to afford the plaintiff an equal opportunity to use and enjoy the dwelling; and (iv) defendants refused to make such an accommodation. *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003). The reasonableness of an accommodation is a case-by-case, fact-intensive inquiry. *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994).

In May 2004, the Department of Housing and Urban Development and United States Department of Justice issued a joint statement concerning reasonable accommodations under the FHA. *See* https://www.hud.gov/sites/documents/huddojstatement.pdf (hereinafter "HUD/DOJ Joint Statement"). The HUD/DOJ Joint Statement encourages an interactive process to produce reasonable accommodations. *Id.* at 7 ("An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider."). As part of that interactive process, "where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. . . [in that case] the provider should discuss with the individual if she is willing to

26

accept the alternative accommodation." *Id.* at 8.  Finally, the guidance contemplates that, while reasonable accommodations may be costly to housing providers, they should neither impose an "undue financial and administrative burden" nor "constitute a fundamental alteration of the provider's operations." *Id.*

### 2.    *Analysis*

Before the Court in Claim 1 are Plaintiff's allegations that Defendants violated the FHA by discriminating against him on the basis of his disability during (i) sporadic elevator outages in 2020 through 2022, (ii) a 2023 wheelchair lift outage, and (iii) a 2025 constructive eviction as a result of a latent elevator defect.  *See* Am. Compl. at ¶¶ 121-217.[11]  Specifically, Plaintiff alleges in Claim 1 that Defendants – because of Plaintiff's disability – delayed and failed to replace or timely repair the elevator and wheelchair lift and denied him his requested reasonable accommodation when the elevator and wheelchair lift had outages.  *Id.* ¶¶ 225-251.

As a threshold matter, the Court observes the following: The Idanha is an historic hotel, retrofitted in the 1970's to be an apartment building.  It has a single elevator, and since 2000, a single wheelchair lift.  In 2016, Plaintiff chose this building and signed a lease that advised him that elevator outages were to be expected and were not a basis for breach of the lease.  Muller Dec. Ex. C. at 5 (Dkt. 51-3).  Accordingly, that periodic, unforeseen outages of the elevator and wheelchair lift would occur – and that such outages would significantly disrupt Plaintiff's life – is not surprising.  The issue before the Court is whether there is a genuine dispute of material fact that Defendants' response to those outages was motivated by discriminatory intent or policy or to deny Plaintiff a reasonable accommodation.

---

[11] As set forth, *supra,* the Court does not consider the alleged prior outages pre-dating the 2019 Settlement Agreement.  *See id.* at ¶¶ 41-119.

27

First, the Court considers Parklane Defendants' response to the sporadic elevator outages in 2020 through 2022.  *See* Am. Compl. at ¶¶ 121-122.  Preceding these outages, Defendants voluntarily upgraded and modernized the elevator.  Howell Dec. at ¶ 38 (Dkt. 52).  And, in June 2020, the elevator passed inspection by the IDOPL.  Howell Decl. at ¶ 44 (Dkt. 52); Howell Second Decl. at ¶ 13 (Dkt. 59-4).  Crucially, any allegation of discriminatory intent or policy, or denial of reasonable accommodation related to the elevator, must be viewed in the context of this voluntary decision.

From 2020 forward, the elevator had minimal maintenance issues.  Howell Decl. at ¶ 39 (Dkt. 52).  Indeed, from 2020 to March 2025, Plaintiff specifically identifies only a single elevator outage (on March 3, 2023) for which Plaintiff's counsel made a three-day demand for repair.  Ertz Dec. Ex. 11 at 21-22 (Dkt. 48-15).  Parklane Defendants repaired the elevator the same day.  Howell Dec. at ¶ 40 (Dkt. 52).  Significantly, none of the elevator maintenance issues from 2020 forward resulted in Plaintiff requesting an accommodation.  *See* Pl.'s SOF at ¶¶ 31-38 (Dkt. 48-1).  Thus, the undisputed evidence before the Court is that, from 2020 forward (at least until to March 2025, *see infra*), Parklane Defendants repaired and modernized the elevator, timely repaired it, and Plaintiff did not request an accommodation in response to outages involving it.

Second, the Court considers Parklane Defendants' response to the wheelchair lift outage in January 2023.  On or about January 1, 2023, the structural frame of the wheelchair lift broke and it would not operate.  Howell Dec. at ¶ 12 (Dkt. 52).  This was the first and only time the structural frame of the wheelchair lift had broken.  *Id.*  While Northwest Elevators recommended replacing the lift, replacement would take six months.  Howell Depo. at 42:4-19.  Accordingly, Mr. Howell decided to repair, rather than replace, the lift because repair could be done more

28

quickly.  Howell Dec. at ¶ 14 (Dkt. 52).[12]  Based on the information he had at the time, Mr. Howell's decision to repair the lift was reasonable.

From January 5, 2023 through February 28, 2023 – while repairs to the lift were ongoing – Plaintiff and Parklane Defendant engaged in the interactive process to identify a reasonable accommodation.  Initially, on January 5, 2023, Plaintiff raised the possibility of relocating to a hotel, but he did not make a firm request.  Muller Dec. Ex. D (Dkt. 51-4).  When Parklane Defendants learned on January 10, 2023 that the lift repair would be more involved, they offered relocation of Plaintiff to another property.  Ertz Dec. Ex. 11 at 33-34 (Dkt. 48-15); Selene Dep. at 147:1-16 (Dkt. 48-5).  From January 12 through January 23, 2023, Plaintiff viewed the Parkhill and Camel's Back Apartments and engaged in a dialogue with Parklane Defendants about the relative size of the units compared to his Idanha apartment.  On January 30, 2023, Plaintiff requested the "reasonable accommodation" of an apartment equal or larger than his Idanha unit to avoid invoking the hotel remedy in the Settlement Agreement.  Muller Dec. Ex. F at 2 (Dkt. 51-6).

On February 3, 2023, Parklane Defendants advised Plaintiff that the lift repair was imminent and temporarily withdrew the apartment offer; at this point, Plaintiff made his first unequivocal request for relocation to a hotel as per the Settlement Agreement.  Muller Dec. Ex. F at 2-3 (Dkt. 51-6).  That day, Parklane Defendants denied the request – maintaining that Plaintiff still had access to his Idanha unit via the freight elevator – and requested more time to complete the lift repair.  *Id.* at 1-2.  On February 6, 2023, Plaintiff's attorney emailed Parklane Defendants a three-day demand letter to repair the lift.  Muller Dec. Ex. K at 2 (Dkt. 51-11).  The same day,

---

[12] Ultimately, notwithstanding a number of vendor-specific delays, the wheelchair lift repair was completed in five months (by May 2023).  Frey Depo. at 85:15 (Dkt. 51-15).

Plaintiff's attorney requested for his client to relocate either to a new two-bedroom apartment or a hotel room as a "reasonable accommodation," and expressed Plaintiff's desire "to only move once." Ertz Dec. Ex. 11 at 4 (Dkt. 48-15).

On February 10, 2023, Parklane Defendants offered Plaintiff a two-bedroom unit – larger than his Idanha unit – at Hillcreek Apartments as a "permanent solution." Muller Dec. Ex. L at 3 (Dkt. 51-12). On February 13, 2023, Plaintiff's attorney rejected the offer of a "permanent move" and again requested relocating Plaintiff to a hotel. *Id.* Parklane Defendants again denied the request. *Id.* at 1-2. On February 27, Parklane Defendants offered the ADA-compliant Camel's Back Apartments unit; Plaintiff's counsel rejected it. *Id.* On February 28, 2023, Parklane Defendants reiterated the offer of the Hillcreek two-bedroom apartment; that day, Plaintiff agreed to move into the Hillcreek unit, and sometime in March, he did. Selene Depo. at 120:15-25 (Dkt. 51-1).

This accommodation was reasonable even if it was not Plaintiff's preferred option. *See Elliot v. QF Circa 37, LLC,* 2018 WL 2933467 at *12 (S.D. Cal. 2018) ("Although a defendant may be required to make a reasonable accommodation, 'it does not have to provide a disabled individual with . . . the accommodation of his choice.'") (citing *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d. Cir. 2012)). While the Settlement Agreement provided for a hotel stay when a conveyor outage prevented access to his apartment, this remedy was pursuant to private contract; it was not compelled by the FHA. Instead, as part of the interactive process contemplated by the HUD/DOJ Joint Statement, Parklane Defendants were entitled to consider administrative burden and cost in offering their own reasonable accommodation. HUD/DOJ Joint Stmt. at 8. At the time of the interactive process, these administrative and cost concerns were acute: (i) the term of the lift repair was indefinite; (ii) the administrative burden of moving Plaintiff's specialized bed,

30

wheelchair, and belongings to a hotel for a short-term stay would have been significant; and (iii) the cost of a long-term stay at a hotel would have been prohibitive and might have fundamentally altered Parklane Defendants' operations. *Id*. Moving Plaintiff into (i) another apartment complex that Parklane Defendants owned and to which Plaintiff relocated in 2019, (ii) that was located near downtown, (iii) into a two-bedroom unit large enough to accommodate his bed, wheelchair, nurses, and belongings, (iv) for as long as the lift repair took, and (v) at no additional cost to Plaintiff, appropriately balanced Plaintiff's disability-related needs against the cost savings and lesser administrative burden for Parklane Defendants. *Id.* at 7. Accordingly, Parklane Defendants did not deny Plaintiff a reasonable accommodation in response to the lift outage. *Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d at 1418.

Third, the Court considers the March 2025 discovery of a latent elevator defect and Plaintiff's allegation of constructive eviction. On March 12, 2025, the IDOPL conducted a five-year inspection of the elevator at the Idanha and found that wires to the elevator improperly had been "jumped" or bypassed, presumably by Northwest Elevators during its 2019 and 2020 upgrade. Howell Dec. at ¶ 41 (Dkt. 52); Ertz Dec. Ex. 3 at 25-26 (Dkt. 48-7). On March 17, 2025, IDOPL notified Parklane Defendants of the latent defect.[13] Howell Dec. at ¶ 42 (Dkt. 52). Critically, however, there is no record evidence that – prior to the March 17, 2025 notification – Parklane Defendants knew about this latent defect to the Idanha elevator. Second Howell Dec. at ¶ 13 (Dkt. 59-4) ("Parklane, Idanha and I were not aware until the inspection in March 2025 that there any residual issues with the elevator after the upgrade. Also, I am not aware of anyone

---

[13] Sometime in March, and apparently before the inspection and notification, Plaintiff had moved out of the Idahna and into the Hillcreek Apartments unit.

jumping a safety device on the elevator between the two state inspections."); *compare* Ertz Dec. Ex. 7 at 12 (Dkt. 48-11) (referencing the Idaho Building, not the Idanha).

Upon learning of the latent defect, Parklane Defendants immediately engaged Young Elevators (a representative of which was present at the IDOPL inspection) to repair it. Because Young Elevators had to order parts and delivery was delayed, Parklane Defendants requested from IDOPL – and on March 28, 2025, IDOPL granted – a 60-day extension of the deadline to repair the elevator. Howell Dec. at ¶ 43 (Dkt. 52). Significantly, IDOPL's extension preceded Plaintiff's three-day demand letter (sent March 31, 2025). *See id.* at ¶ 45. Young Elevators completed the repair by July 2025; IDOPL issued a temporary certificate of operation on July 17, 2025 and a final certificate to operate on August 19, 2025. Under the circumstances, Parklane Defendants acted immediately and reasonably in repairing the latent defect to the elevator; Plaintiff was not constructively evicted as a result.

In sum, as set forth above, Plaintiff has failed to make a sufficient showing – and there is an absence of record evidence – to establish essential elements of disability discrimination under the FHA and set forth in Claim 1. *Celotex,* 477 U.S. at 322, 325. First, as to both disparate treatment and disparate impact theories, Plaintiff has not shown that Parklane Defendants had a *policy* that disparately treated or affected Plaintiff. *Cmty. House*, 490 F.3d at 1048. Instead, Parklane Defendants responded to isolated and unforeseen outages of the elevator and wheelchair lift by repairing, rather than replacing, the conveyors. Under the particular circumstances of this case, Parklane Defendants' repair decisions were timely-made and reasonable. Second, there is an absence of circumstantial evidence of discriminatory intent that would support a disparate treatment theory. *Pac. Shores Props.*, 730 F.3d at 1158. As set forth above, Parklane Defendants engaged in a good-faith interactive process with Plaintiff; to the

extent that Parklane Defendants resisted the hotel remedy, they were motivated by considerations of cost and administrative burden – appropriate under the DOJ/HUD Joint Statement – not discrimination.[14]   Finally, there is no evidence that Parklane Defendants refused to provide Plaintiff with a reasonable accommodation after the wheelchair lift broke (or at any point). *Giebeler*, 343 F.3d at 1147.  Quite the contrary.  As a result of the interactive process, Parklane Defendants relocated Plaintiff to a larger, two-bedroom apartment near downtown and at no additional cost to him.  Accordingly, Plaintiff has failed to make a sufficient showing – and there is an absence of record evidence – to establish the existence of the required elements of Claim 1 and it fails as a matter of law.  *Celotex*, 477 U.S. at 322, 325.

## C.      <u>Claim 2: FHA Interference</u>

Both Plaintiff and Parklane Defendants move for summary judgment on Claim 2.  In his motion for partial summary judgment, Plaintiff argues that he attempted to exercise his rights under the FHA by requesting a reasonable accommodation of moving to a hotel, as per the Settlement Agreement, and that Parklane Defendants interfered with his rights by denying this request.  Pl.'s Mem. in Sup. of MPSJ at 14-15 (Dkt. 48-2).  In his response to Parklane Defendants' motion, he further argues that Parklane Defendants interfered with his rights by

---

[14] To the extent that Plaintiff relies on the deposition testimony of Mr. Ward that Plaintiff was viewed by some employees as a "high-maintenance tenant" who would be easier to handle "if he lived in a different property that was more accessible and in better repair than the Idanha" as circumstantial evidence of discriminatory intent, there is an absence of contemporaneous corroboration that Parklane Defendants wanted to permanently displace Plaintiff from the Idanha.  *See* Pl.'s Comb. Resp. to Defs.' MSJ at 9-10 (Dkt. 60); Ward Depo. 138:19-139:1 (Dkt. 48-6).  On January 16, 2023, Mr. Frey instructed Mr. Ward to find Plaintiff a comparable property that met his needs and show it to him; he explained, "[b]y comparable we mean one with comparable rent for that which he is currently in *as this move will be temporary* and the Idanha will be paying the difference."  Muller Dec. Ex. J at 2 (Dkt. 51-10) (emphasis added).  While Parklane Defendants offered to relocate Plaintiff to Hillcreek Apartments and characterized the move as a "permanent solution," this characterization was in direct response to Plaintiff's counsel's request for a reasonable accommodation where Plaintiff would "only move once."  Ertz Dec. Ex. 11 at 4 (Dkt. 48-15).  Finally, after the wheelchair lift was repaired, Parklane Defendants advised BCACHA that Plaintiff could move back into the Idanha.  Howell Dec. Ex. G at 23 (Dkt. 52-7).  Viewed in this context, Mr. Ward's deposition testimony does not amount to circumstantial evidence of discriminatory intent.

trying to coerce him into signing a long-term lease at the Hillcreek Apartments, increasing his housing costs, and denying him his mail.  Pl.'s Comb. Resp. to Defs.' MSJ at 12 (Dkt. 60); Selene Decl. at ¶¶ 51-56 (Dkt. 60-2).

In their motion for partial summary judgment, Parklane Defendants argue that Claim 2 does not specifically identify the adverse action they allegedly took to interfere with Plaintiff's rights under the FHA.  Parklane Defs.' Mem. in Sup. of MPSJ at 17-18 (Dkt. 49-1).  Further, Parklane Defendants argue that there is no record evidence of any adverse action they took that interfered with Plaintiff's rights under the FHA because they provided Plaintiff with a reasonable accommodation, namely relocation to the Hillcreek Apartments.  *Id.*  They also maintain that there is no admissible evidence that Parklane Defendants tried to coerce Plaintiff into signing a long-term lease at Hillcreek, increased his housing costs, or denied him mail.  *See* Parklane Defs.' Reply to MPSJ at 2-3 (Dkt. 66).

### 1.    *Legal Standard*

To establish a prima facie case of interference under the FHA, a plaintiff must show (i) that he engaged in protected activity under the FHA; (ii) the defendant subjected him to an adverse action; and (iii) a causal link exists between the protected activity and the adverse action. *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate nondiscriminatory reason for its decision." *Ohio House*, 135 F.4th at 670.  If the defendant can do so, the burden returns to the plaintiff to show that the reason was merely pretextual.  *Id.*

### 2.    *Analysis*

To begin, the Court finds that Plaintiff's request to relocate to a hotel in response to the wheelchair lift outage was a protected activity under the FHA.  A good-faith request for a

reasonable accommodation is protected activity under the FHA.  *See, e.g., Alberts v. Bridge Housing Corp.*, 2026 WL 962716, at *5 (S.D. Cal. Apr. 9, 2026).  Having previously settled the 2019 disability-discrimination lawsuit, and the parties having specifically contemplated a remedy for future outages of conveyors in the Settlement Agreement, Plaintiff's invocation of that remedy surely was a request for a reasonable accommodation that was protected.  Parklane Defendants only half-heartedly contest this.  *See* Parklane Defs.' Mem. in Sup. of MPSJ at 18 (Dkt. 49-1) ("While requesting a reasonable accommodation under the FHA may be considered a protected activity. . ."); Parklane Defs.' Resp. to Pl.'s PMSJ at 12 (Dkt. 59) ("Assuming arguendo that the 2019 Settlement Agreement could be considered a request for reasonable accommodation . . .").  Thus, the Court finds that there is sufficient record evidence to satisfy element one of Claim 2.

However, Plaintiff has failed to make a sufficient showing to establish element two of Claim 2: adverse action.  *Celotex,* 477 U.S. at 322, 325.  As set forth in greater detail above, Plaintiff had a contractual right to a hotel stay under the Settlement Agreement.  *See supra* Section I.A. at 5.  Under the FHA, however, Plaintiff had the right only to *a* reasonable accommodation, not necessarily the reasonable accommodation *of his choice.  See Elliot,* 2018 WL 2933467 at *12.  Thus, when Parklane Defendants rejected a hotel stay – but, as a result of the interactive process, provided a larger, two-bedroom unit at Hillcreek Apartments that Plaintiff ultimately accepted – they did not engage in adverse action that interfered with Plaintiff's rights under the FHA.

Likewise, there is an absence of record evidence that Parklane Defendants attempted to coerce Plaintiff to permanently relocate to Hillcreek Apartments.  *Celotex,* 477 U.S. at 325.  As set forth above (*supra* at n.14), Parklane Defendants recognized from the start that Plaintiff's

relocation from the Idanha to Hillcreek would be temporary.  Muller Dec. Ex. J at 2 (Dkt. 51-10).  After the wheelchair lift repair was complete, Parklane Defendants advised BCACHA that Plaintiff could return to the Idanha.  Howell Dec. Ex. G at 23 (Dkt. 52-7).  Plaintiff did not return to the Idanha primarily because BCACHA did not initially approve the repairs, not because of any action taken by Parklane Defendants.[15]

As it relates to Plaintiff's allegation of increased rent, he has provided no proof to support it.  *See* Selene Decl. at ¶ 54.  Indeed, at oral argument, counsel for Plaintiff did not contest the representation that Plaintiff's rent at the Idanha was not increased relative to other tenants, Plaintiff received invoices only from the Idanha, and never was charged additional rent by Hillcreek.  To the extent there was a rent increase, there is no record evidence that BCHCHA did not approve it.  Thus, there is no record evidence that Parklane Defendants increased Plaintiff's rent as retaliation.

Finally, as to Plaintiff's allegation that he was denied his mail at Hillcreek, *see* Selene Decl. at ¶ 55, there is no record evidence that this was Parklane Defendants' fault.  Again, an agent of Parklane Defendants advised Plaintiff that signing a tenancy agreement was a requirement to establish residency and to obtain mail at Hillcreek.  *Id.* at 52.  Plaintiff refused to sign the tenancy agreement.  *Id.* at ¶ 51.  Thus, there is no record evidence that Parklane Defendants are responsible for Plaintiff having to rely on friends and service providers to retrieve his mail from the Idanha.  *See id.* at ¶ 55.

---

[15] Even if the Court credits Plaintiff's declaration that an agent of Parklane Defendants requested that Plaintiff sign a new tenancy agreement at Hillcreek, *see* Selene Decl. at ¶¶ 51-52, Plaintiff did not produce the tenancy agreement. Accordingly, the Court has no basis to evaluate the length of the proposed tenancy, whether it was month-to-month or for a term, or whether it was conditioned on completion of the lift repair at the Idanha.  Without such proof, the Court will not speculate that the request was coercive or that it was anything more than a pro forma requirement to establish his residency at Hillcreek. *See* Parklane Defs.' Reply to MPSJ at 2 (Dkt. 66).

In sum, Plaintiff has failed to make a sufficient showing – and there is an absence of record evidence – to establish the existence of the required element of adverse action for Claim 2, and thus, Claim 2 fails as a matter of law. *Celotex*, 477 U.S. at 322, 325.

**D.    Claim 3: Violation of Idaho Code § 6-320**

Parklane Defendants (but not Plaintiff) move for summary judgment on this claim. Plaintiff's Amended Complaint alleges that Parklane Defendants failed to timely repair the Idanha's wheelchair lift and elevator and thereby violated Idaho Code § 6-320 in two ways: (i) by failing to maintain in good working order electrical, plumbing, heating, ventilating, cooling, or sanitary facilities supplied by the landlord; and (ii) by maintaining the premises in a manner hazardous to the health and safety of the tenant. *See* Am. Compl. at ¶¶ 260-61, 263.

In their motion for partial summary judgment, Parklane Defendants argue that each of the demands for repair of the wheelchair lift and elevator is not actionable because Parklane Defendants either began or completed the demanded repair within a three-day notice period. Parklane Defs.' Mem. in Sup. of MPSJ at 19-22 (Dkt. 49-1). Where the repairs began but could not be completed within the three-day period, Parklane Defendants argue that enforcing Section 6-320 against them serves no purpose. *Id.* at 19.

Plaintiff responds that the filing of the three-day demand notice is merely a jurisdictional hurdle that confers standing. Even if Parklane Defendants commenced repairs on the lift and elevator during the three-day period, Plaintiff argues he is still entitled to recover damages if the fixes were insufficient to maintain the premises in a safe and habitable condition. Pl.'s Comb. Resp. to Defs.' MSJ at 13-14 (Dkt. 60). Thus, he claims a genuine dispute of material fact remains. *Id.* at 14.

**1.    *Legal Standard***

37

Idaho Code Section 6-320 (hereinafter "Section 6-320") is the statutory codification of

the implied warranty of habitability in Idaho. *Florer v. Walizada*, 168 Idaho 932, 935 (2021).  In

relevant part, it provides:

> (a) A tenant may file an action against a landlord for damages and specific performance for:
>
> > (1) Failure to provide reasonable waterproofing and weather protection of the premises;
> >
> > (2) Failure to maintain in good working order electrical, plumbing, heating, ventilating, cooling, or sanitary facilities supplied by the landlord;
> >
> > (3) Maintaining the premises in a manner hazardous to the health or safety of the tenant;
> >
> > * * *
> >
> > (5) Breach of any term or provision of the lease or rental agreement materially affecting the health and safety of the tenant, whether explicitly or implicitly a part thereof[.]

Idaho Code Ann. § 6-320(a).

Section 6-320 imposes on tenants a notice requirement.  It provides:

> Before a tenant shall have standing to file an action under this section, he must give his landlord three (3) days written notice, listing each failure or breach upon which his action will be premised and written demand requiring performance or cure. If, within three (3) days after service of the notice, any listed failure or breach has not been performed or cured by the landlord, the tenant may proceed to commence an action for damages and specific performance.

*Id.* at § 6-320(d).

Section 6-320 is a strict liability statute.  If tenants comply with the notice requirement,

landlords are strictly liable for uncured breaches. *Jesse v. Lindsley*, 149 Idaho 70, 74 (2008)

(citing *Silver Creek Computers v. Petra, Inc*., 136 Idaho 879, 883 (2002)).  Indeed, Section 6-320

"is primarily directed toward giving the tenant leverage to require the landlord to keep the premises in good order," and as such, "establishes a public policy that a landlord must maintain premises in a manner that is not hazardous to the health or safety of the tenant." *Id.* at 76. Accordingly, a tenant need not prove negligence to obtain relief under Section 6–320. *Id.* at 74.

### 2.    *Analysis*

The Court structures its analysis by analyzing each of the three (3) three-day demands made by Plaintiff: (i) the March 3, 2023 elevator repair, (ii) the March 31, 2025 elevator repair, and (iii) the February 6, 2023 wheelchair lift repair.  Because a three-day demand is a jurisdictional prerequisite to commencing a suit under Section 6-320, only these demands are properly before the Court. *Florer*, 168 Idaho at 935-36.

As a threshold matter, the Court addresses the construction of Section 6-320 and how it applies if a landlord *begins* a repair within the three-day period, but does not *complete* it.  Under the plain language of the statute, in such a circumstance, the landlord technically has not "performed" or "cured" the "failure" or "breach." *See* Idaho Code Ann. § 6-320(d).  Thus, he is not immune from the tenant "commencing" suit. *Id.*  However, it is often impracticable for a landlord to complete repairs within three days, especially where (as here) the repair is intricate, or parts and labor are unavailable in the interim.  Accordingly, the Court takes a pragmatic approach and one that is consistent with the public policy underlying Section 6-320 that landlords "maintain premises in a manner that is not hazardous to the health or safety of the tenant." *Jesse*, 149 Idaho at 76.  Namely, where a landlord begins but does not complete a repair within the three-day period, the Court looks to what other measures the landlord took to cure the breach or failure and thereby protect the health and safety of the tenant.  With that principle in mind, the Court addresses each of the three demands.

39

a.      *March 3, 2023 Elevator Demand*

On March 3, 2023, Plaintiff's counsel notified Parklane Defendants that the elevator was nonfunctional and demanded its repair within three days.  Ertz Dec. Ex. 11 at 21-22 (Dkt. 48-15).  However, Parklane Defendants repaired the elevator the same day.  Howell Dec. at ¶ 40 (Dkt. 52).  Thus, because Parklane Defendants remedied the underlying failure within the three-day notice period, this demand is not actionable under Section 6-320.  *Silver Creek*, 136 Idaho at 884.[16]

b.      *March 31, 2025 Elevator Demand*

On March 31, 2025, Plaintiff's counsel notified Parklane Defendants that the elevator had failed an IDOPL inspection, due to the discovery of the latent defect of "jumped" or bypassed wires, and demanded its repair within three days.  Howell Dec. at ¶ 45 (Dkt. 52).  By that date, Parklane Defendants had already initiated service on the elevator; the repair company had already committed to making any required repairs to the elevator.  *Id.* at ¶ 45.  However, the repairs were not completed within three days (by April 3, 2025).  That is because the repairs were intricate and overseen by IDOPL.  *Id.* at ¶ 46.

Importantly, while Plaintiff maintained his unit and the underlying lease at the Idanha, Plaintiff was not a physical resident at the Idanha when his counsel made the three-day demand.  Indeed, Plaintiff had relocated to the Hillcreek Apartments nearly two years prior, in March of 2023.  Selene Depo. at 120:15-25 (Dkt. 51-1).  This limits Plaintiff's ability to sue under Section 6-320.

---

[16] That there was a later dispute regarding a latent defect involving jumping of wires for the elevator does not disturb this finding.  There is no record evidence that the March 3, 2023 malfunction to the elevator was related to this latent defect.  Instead, it is undisputed that Parklane Defendants repaired the malfunction that was the subject of the March 3, 2023 three-day demand letter and the elevator thereafter was operational.

40

The Supreme Court of Idaho has held that "a tenant's right to sue under I.C. § 6–320 is not invariably precluded because at the time the three days' notice was given the tenant was no longer in physical possession." *Worden v. Ordway*, 105 Idaho 719, 722 (1983). However, where the tenant is no longer in physical possession, the right to sue under Section 6-320 is circumscribed only to those violations "that can occur irrespective of possession by the tenant." *Id.* (citing failure to return security deposit and breach of implied covenant of quiet enjoyment by wrongfully locking a tenant out of the premises).

That is not the case here. Plaintiff's Amended Complaint alleges violations of Section 6-320 that hinge on Plaintiff's physical residency. Namely, he alleges violation of Sections 6-320(a)(2) (for failure to maintain in good working order an electrical facility) and (a)(3) (maintaining premises in a manner hazardous to the health and safety of the tenant). Am. Compl. at ¶¶ 260-61 (Dkt. 42). Because these violations cannot occur "irrespective of possession by the tenant" – but rather require his physical residency and personal exposure to the alleged hazardous conditions – the instant March 31, 2025 repair demand fails as a basis for liability in Claim 3 as a matter of law. *See Worden*, 105 Idaho at 722.

   c.  *February 6, 2023 Wheelchair Lift Demand*

On February 6, 2023, counsel for Plaintiff notified Parklane Defendnats that the wheelchair lift was nonfunctional and demanded cure within three days. Ertz Dec. Ex. 11 at 6-7 (Dkt. 48-15). At the time, the lift had been out of service since approximately January 1, 2023, and repairs were underway. Howell Dec. at ¶ 16 (Dkt. 52). However, the lift was not repaired within three days of the demand (by February 9, 2023).

Parklane Defendants argue that they are entitled to summary judgment because they had already begun repairs to the lift when they received the demand, and the repair could not

41

possibility be completed within three days of the demand. Parklane Defs.' Mem. in Sup. of MPSJ at 20-21 (Dkt. 49-1). Under such circumstances, they argue that Section 6-320 serves no purpose. *Id.* at 19. Here, the Court disagrees.

At the time of this demand, Plaintiff physically resided at the Idanha. Three days before this demand, on February 3, 2023, Plaintiff made his first unequivocal request to be relocated to a hotel, pursuant to the Settlement Agreement. Muller Dec. Ex. F at 2 (Dkt. 51-6). That same day, Parklane Defendants denied this request, explicitly stating that "we have provided means for you to enter and exit the building by calling maintenance to use the freight elevator." *Id.* at 1-2.

However, the freight elevator is not meant for human passenger use. *See* Frey Depo. at 31-33 (Dkt. 54-2); Brumbaugh Depo. at 27-29 (Dkt. 54-1). It consists of a flat platform, without any guardrails, that lifts approximately 12 feet on a single pulley. Selene Depo. at 132:1-9 (Dkt. 48-5). It is not regulated or inspected by the IDOPL and does not have a Certificate of Operation for passenger use. *Id.* Further, it bears a warning sign that reads: "ABSOLUTELY NO RIDERS!!!! ///// FREIGHT ONLY." Ertz. Dec. Ex. 8 at 4 (Dkt. 48-12).[17]

After unequivocally requesting relocation to a hotel on February 3, 2023, and being denied by Parklane Defendants, Plaintiff was *forced* to use the freight lift to access his apartment until sometime in March 2023 when he moved out of the Idanha and into the Hillcreek Apartments. *See* Selene Depo. at 120:15-25 (Dkt. 51-1). This notwithstanding that there was another option available to protect him from this arguable hazard, namely temporary relocation to a hotel at Parklane Defendant's cost. This is precisely the situation and public policy concern Section 6-320 was designed to address. *See Jesse*, 149 Idaho at 76.

---

[17] Plaintiff described the lift as "rickety" and "dirty and frightening and [] scary" for him to ride. Selene Depo. at 132:1-10 (Dkt. 48-5).

Thus, the fact that Parklane Defendants had commenced, but could not complete, repair to the wheelchair lift within three days of the February 6, 2023 demand will not insulate them from lawsuit under Section 6-320 based on this demand.  Claim 3 survives Parklane Defendant's motion for partial summary judgment to this extent.[18]

In sum, as to Claim 3, the Court grants Parklane Defendants' motion for partial summary judgment on the elevator demands (dated March 3, 2023 and March 31, 2025) but denies it on the wheelchair lift demand (dated February 6, 2023).

### E.      Claim 4: Breach of Contract

Plaintiff (but not Defendants) moves for summary judgment on this claim.  Plaintiff's Amended Complaint alleges that Defendants breached the Settlement Agreement. Am. Compl. at ¶¶ 267-71 (Dkt. 42).  Plaintiff argues he is entitled to summary judgment because Defendants unambiguously breached the Settlement Agreement's remedy provision.  Pl.'s Mem. in Sup. of MPSJ at 8 (Dkt. 48-2).  Specifically, Plaintiff claims Defendants breached the remedy provision each time they denied his request to stay at a hotel.  *Id.* at 9.

Parklane Defendants concede that the Settlement Agreement is a binding contract, but they contest that they breached it.  Parklane Defs.' Resp. to Pl.'s MPSJ at 5-10 (Dkt. 59).  Specifically, Parklane Defendants argue that the Settlement Agreement is ambiguous as to what constitutes breach of the remedy provision, and that a genuine dispute of material fact exists as to whether breach occurred here, given that (i) the wheelchair lift and elevator were out of service for extended periods (beyond the temporary outages contemplated by the Settlement Agreement), (ii) Plaintiff was able to access his apartment through the freight lift (so he was not

---

[18] To be clear, recoverable damages based on this demand would run from February 3, 2023 until the date in March 2023 on which Plaintiff physically moved out of the Idanha and was no longer involuntarily exposed to the arguably hazardous condition.

unable to return to his unit as required by the Settlement Agreement), and (iii) Plaintiff made repeated requests for an alternative apartment (in conjunction with requests for a hotel under the Settlement Agreement). *Id.* at 6-7.

### 1. Legal Standard

Under Idaho law, a breach of contract claim has four elements: (1) the existence of a contract, (2) the breach of that contract, (3) damages resulting from the breach, and (4) the amount of damages. *Mosell Equities, LLC v. Berryhill & Co.*, 154 Idaho 269, 278 (2013); *cf. Elemental Research Inc. v. Brunson*, 2025 WL 2508380, at *5 (D. Idaho Sept. 2, 2025) ("Under Idaho law, the elements of a breach of contract claim are that a contract between the plaintiff and defendant existed and that while the contract was in force against the defendant, the defendant engaged in conduct that violated the contract and caused damages").

### 2. Analysis

As a threshold matter, Defendants first argue that they did not breach the remedy provision because it was intended only to address short-term outages. Parklane Defs.' Resp. to Pl.'s MPSJ at 5-10 (Dkt. 59). Defendants' argument is unavailing. In Idaho, as in other jurisdictions, courts "begin[] with the document's language." *River Range, LLC v. Citadel Storage, LLC*, 166 Idaho 592, 599 (Idaho 2020). Where the relevant contractual text is unambiguous, a court must read it in its plain and ordinary sense. *Id.* Here, while the remedy provision does reference "temporary lodging," and contemplates that outages would be resolved within a day or two, there is no explicit temporal limitation; rather, the provision entitles Plaintiff to $250 for "each day . . . [he] is unable to return to his apartment." Sealed Ex. 1 at 3-4 (Dkt. 3). The Court finds that the contractual text of the remedy provision is unambiguous and breach occurs where Plaintiff invokes the provision, charges the debit card for transportation, food, or

44

temporary lodging (up to $250 for each day he is unable to return to his apartment due to outages of the wheelchair lift or elevator), and Defendants fail to reimburse him.

However, on the record before the Court, a genuine dispute of material fact exists over whether (i) Plaintiff invoked the remedy provision and (ii) was unable to return to his apartment. First, a genuine dispute of material fact exists as to whether Plaintiff invoked the provision. Until February 3, 2023, Plaintiff simultaneously discussed with Parklane Defendants relocating to an alternative apartment and a hotel. Even when Plaintiff unequivocally requested a hotel on February 3, he soon thereafter continued the dialogue about an alternative apartment. Ultimately, Plaintiff agreed to relocate to the Hillcreek Apartments. At no point did Plaintiff use the provided debit card to make charges for transportation, food, and temporary lodging at a hotel. While the remedy provision is arguably self-executing, a genuine dispute of material fact exists as to whether it was breached when Plaintiff did not voluntarily move into a hotel and charge the debit card.

Second, a genuine dispute of material fact exists as to whether Plaintiff was unable to return to his apartment, thereby triggering the remedy provision. Putting aside that, after February 3, 2023, Plaintiff arguably was forced to use a hazardous freight lift to access his apartment in violation of Section 6-320, *see supra* Section III.D.s., he did in fact use the freight lift to access his apartment. *See* Frey Depo. at 73:17-76:4 (Dkt. 54-2). Thus, on those occasions, he technically was not "unable" to return to his apartment and there is a genuine dispute over whether the remedy provision was breached.

Accordingly, because there are genuine disputes of material fact regarding breach of the Settlement Agreement – namely, whether Plaintiff invoked the remedy provision and was unable to return to his apartment – Plaintiff's motion for summary judgment on Claim 4 fails.

**F.**    <u>**Claim 5: Idaho Consumer Protection Act**</u>

Both Plaintiff and Parklane Defendants move for summary judgment on Claim 5. Plaintiff's Amended Complaint alleges that Defendants violated the ICPA by engaging in unfair and deceptive practices in the conduct of trade or commerce against a disabled person. Am. Compl. at ¶¶ 272-90. In his motion for partial summary judgment, Plaintiff argues that Defendants engaged in deceptive practices when, in 2019, they enticed Plaintiff to dismiss his lawsuit and enter into a one-sided Settlement Agreement with no intention of honoring it, and then in 2023, unfairly interpreted the terms of the Settlement Agreement in refusing to honor it. Pl.'s Mem. in Sup. of MPSJ at 16-20 (Dkt. 48-2). Moreover, Plaintiff alleges that Defendants engaged in deceptive and unconscionable conduct in 2023 by making misrepresentations regarding the status of repairs and using their asymmetry of information against him. Pl.'s Comb. Resp. to Defs.' MSJ at 14-15 (Dkt. 60).

In their motion for partial summary judgment, Parklane Defendants argue that the Settlement Agreement is not cognizable under the ICPA because it is not a contract to provide a "good" or "service," but rather, a stand-alone agreement to resolve a civil lawsuit. Parklane Defs.' Mem. in Sup. of MSJ at 25-26 (Dkt. 49-1); Parklane Defs.' Resp. to Pl.'s MPSJ at 14 (Dkt. 59). Moreover, Parklane Defendants respond that (i) their 2023 conduct is irrelevant to any inducement of Plaintiff to enter into the Settlement Agreement in 2019; (ii) there is no evidence to support that they unconscionably interpreted the Settlement Agreement in 2023; and (iii) they did not make contradictory representations in 2023 that amounted to a "bait and switch" under the ICPA. Parklane Defs.' Resp. to Pl.'s MPSJ at 15-18 (Dkt. 59).

   *1.    Legal Standard*

The ICPA is a remedial statute whose purpose is "to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." I.C. § 48-601. Under the ICPA, "[a]ny person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter, may treat any agreement incident thereto as voidable or, in the alternative, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater . . . ." *Id.* at § 48-608(1). Enhanced penalties – the greater of $15,000 or treble actual damages – apply if the aggrieved consumer is disabled. *Id.* at § 48-608(2).

The ICPA defines "goods" as "any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, including certificates or coupons exchangeable for such goods." I.C. § 48-602(6). The ICPA defines "services" as "work, labor or any other act or practice provided or performed by a seller to or on behalf of a consumer." I.C. § 48-602(7).

There are three elements to a claim under the ICPA: (i) the consumer purchased goods or services from a seller; (ii) the seller engaged in unfair or deceptive act(s) or practice(s) that are declared unlawful under the ICPA; and (iii) the unfair act(s) or practice(s) caused the consumer to suffer an 'ascertainable loss of money or property' (real or personal). *Litster Frost Injury Lawyers, PLLC v. Idaho Injury Law Grp., PLLC*, 171 Idaho 1, 6 (2022).

### 2.    *Analysis*

By its express terms, the ICPA protects consumers in the "conduct of trade and commerce." I.C. § 48-601. Specifically, it protects consumers who purchase or lease "goods" or

47

"services" from unfair or deceptive practices by sellers. *See Litster Frost*, 171 Idaho at 6. Conversely, the ICPA is not a mechanism for parties to address the inducement or performance of private, non-commercial contracts.

Here, the Settlement Agreement is not a commercial contract for Plaintiff to purchase or lease "goods" or "services." Instead, it is a non-commercial agreement between Plaintiff and Defendants to settle the 2019 lawsuit. As set forth in the Settlement Agreement, Defendants agreed to provide an upfront sum of money to Plaintiff in exchange for Plaintiff releasing them from all claims and liability and dismissing the 2019 lawsuit with prejudice. *See* Sealed Ex. 1 at 1-2 (Dkt. 3). As set forth *supra*, Defendants also agreed to provide Plaintiff with a debit card that Plaintiff could use prospectively to pay for transportation, food, and temporary lodging for each day he was unable to access his apartment due to conveyor outages. *Id.* In sum and in substance, all that Defendants promised in the Settlement Agreement was to provide Plaintiff with money and nothing more.

Money is not a "good" under the ICPA; it is not "property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, including certificates or coupons exchangeable for such goods." I.C. § 48-602(6).[19] Nor is the provision of money a "service" under the ICPA; it is not "work, labor or any other act or practice provided or performed by a seller to or on behalf of a consumer." I.C. § 48-602(7). Importantly, Plaintiff provides no authority that holds otherwise. Because the Settlement Agreement does not involve the provision of goods or services, Plaintiff cannot make a sufficient showing to establish the existence of the first element of an ICPA claim. *Celotex,* 477 U.S. at 322; *Litster Frost,* 171 Idaho at 6.

---

[19] While money *has* value, it is not a "*thing* of value" as contemplated by the ICPA.

That the underlying transaction between Plaintiff and Defendants is a residential lease will not transform Plaintiff's claim and save it from summary judgment. The foundation of Plaintiff's ICPA claim is alleged deception and unfair practices by the Defendant in the inducement, interpretation, and performance of the Settlement Agreement. Plaintiff does not make any such allegations related to the terms or provisions of the original lease agreement.[20]

Hence, the deception and unconscionable conduct alleged by Plaintiff in Claim 5 is not cognizable under the ICPA, and Claim 5 fails as a matter of law. Accordingly, the Court will grant Parklane Defendant's motion for partial summary judgment, and deny Plaintiff's motion for partial summary judgment, on Claim 5.

**G.      Claim 6: Negligence**

Parklane Defendants (and not Plaintiff) move for summary judgment on Claim 6. Claim 6 alleges three duties of care that Defendants owed to Plaintiff, and breaches thereof. *See* Am. Compl. at ¶¶ 292-96. First, it alleges that Defendants owed Plaintiff a duty to comply with the Idaho Elevator Safety Act and breached it when the elevator failed inspection in March 2025. *Id.* at ¶¶ 292-294. Second, it alleges that Defendants owed Plaintiff a duty to operate the premises free from unlawful disability discrimination, and breached that duty by failing to train, hire, supervise, and discipline its employees in accordance with fair housing laws. *Id.* at ¶ 295. Third, it alleges Defendants owed Plaintiff a duty to maintain the premises in a safe and habitable manner and generally breached that duty. *Id.* at ¶¶ 296-97.

---

[20] Even if he did, Plaintiff provides no authority that a residential lease agreement involves the provision of a "good" or "service" under the ICPA.

Parklane Defendants argue that Plaintiff cannot show they owed him a duty of care under the common law, nor the physical harm required to maintain a negligence claim. Parklane Defs.' Mem. in Sup. of MPSJ at 24-26 (Dkt. 49-1).

In response, Plaintiff argues that Defendants owed Plaintiff statutory duties of care and Defendants' violation of those statutes could constitute negligence per se. Pl.'s Comb. Resp. to Defs.' MSJ at 16 (Dkt. 60). Further, Plaintiff argues that he suffered physical injury in the form of "physical alienation from home." *Id.* at 15.

### 1.    *Legal Standard*

A common-law action for negligence requires a plaintiff to prove: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Oswald v. Costco Wholesale Corp.*, 167 Idaho 540, 550 (2020).

Statutes and administrative regulations may proscribe a duty of care, such that their violation constitutes negligence *per se*. *O'Guin v. Bingham Cnty.*, 142 Idaho 49, 52 (2005). In order to replace a common law duty of care with a duty of care from a statute or regulation, the following elements must be met: (1) the statute or regulation must clearly define the required standard of conduct; (2) the statute or regulation must have been intended to prevent the type of harm the defendant's act or omission caused; (3) the plaintiff must be a member of the class of persons the statute or regulation was designed to protect; and (4) the violation must have been the proximate cause of the injury. *Id.* "The effect of establishing negligence per se through violation of a statute is to conclusively establish the first two elements of a cause of action in negligence." *Slade v. Smith's Management Corp.*, 119 Idaho 482, 489 (1991).

50

In the landlord-tenant context, Section 6-320 provides a statutory version of the implied warranty of habitability. *Jesse,* 149 Idaho at 74 (citing *Worden*, 105 Idaho at 723) ("The Idaho legislature has already acted in this area and enacted a statutory version of the implied warranty of habitability theory. I.C. § 6–320. This Court should refrain from changing or expanding a common law rule, where the legislature has already acted in the same area."). Thus, the Idaho Supreme Court has explained: "[T]he rule is that a landlord must exercise reasonable care under the circumstances for the protection of his residential tenant. This includes the duty under I.C. § 6–320 to maintain the premises in a manner that is not hazardous to the health or safety of the tenant." *Jesse,* 149 Idaho at 75.

In pertinent part, the Idaho Elevator Safety Act (hereinafter "IESA") provides:

> (1) The person installing or altering a conveyance is responsible for its operation and maintenance until the division has issued an operating certificate for the conveyance. The owner is responsible for all tests of a new, relocated or altered conveyance until the division has issued an operating permit for the conveyance.
>
> (2) The owner shall be responsible for the safe operation and proper maintenance of the conveyance after the division has issued the operating certificate and also during the period of effectiveness of any temporary operating permit. The owner shall be responsible for assuring that all required periodic tests are performed by a QEI as defined in this chapter.

I.C. § 39-8609.

### 2.    *Analysis*

The Court addresses each of the bases for negligence in the order set forth in the Amended Complaint.

#### a.    *Duty Under IESA and Common Law as to Elevator*

As it relates to the main elevator, the Court understands Plaintiff's negligence claim to sound in both common law negligence and negligence *per se.* Namely, Plaintiff alleges that

Defendants had a common law duty to operate the elevator safely and habitably – and a statutory duty to operate the elevator according to the duties set forth in the IESA – and breached those duties as evidenced by the March 2025 failed inspection.  While Plaintiff has provided no authority that these duties can support common law negligence or negligence per se claims, the Court will assume *arguendo* that they do.  Even so, Defendants did not violate these duties.

First, the Court considers negligence per se.  The IESA imposes on owners of passenger elevators a duty to operate elevators on their premises safely by: (i) obtaining periodic inspections, at least every five years, from a Qualified Elevator Inspector ("QEI"), (ii) operating the elevator with a certificate of operability issued by the QEI, and (iii) discontinuing operation of the elevator in the absence of a certificate of operability (or upon an order to discontinue). I.C. § 39-8609-8618.  Significantly, a failed inspection does not violate the IESA; operating the elevator without a certificate of operability, or in contravention of an order to discontinue operation, does.

Here, Plaintiff has not provided a sufficient showing that Parklane Defendants violated the IESA.  *Celotex,* 477 U.S. at 322.  Rather, the undisputed evidence before the Court is that the (i) Parklane Defendants obtained an inspection by the IDOPL in 2000, (ii) the elevator passed inspection and the IDOPL renewed its certificate of operability, (iii) Parklane Defendants obtained an inspection by the IDOPL in March 2025, (iv) when the elevator failed that inspection, Parklane Defendants did not operate it without a certificate of operability or in contravention of an order to discontinue operation, (v) Parklane Defendants timely repaired the "jumped" wires by July 2025, and (v) Parklane Defendants obtained from IDOPL a temporary certificate of operability in July 2025 and a final certificate of operability in August 2025.  *See* Howell Dec. ¶¶ 41-46, 50 & Ex. P (Dkt. 52).  Thus, as it relates to the elevator, Parklane

Defendants did not violate the IESA, and accordingly, IESA cannot support a per se negligence theory.

Next, as it relates to the elevator, the Court considers common law negligence. Here, the Court finds that Plaintiff has not made a sufficient showing that Parklane Defendants failed to act with reasonable care under the circumstances. *Celotex,* 477 U.S. at 322; *Jesse,* 149 Idaho at 75. As set forth in greater detail *supra*, (i) Northwest Elevator upgraded the elevator in 2019 and 2020, (ii) between 2020 and 2025, the elevator had infrequent maintenance issues and Plaintiff made a single three-day demand for repair (on March 3, 2023), (iii) Parklane Defendants made timely repairs, (iv) until the March 2025 inspection, the Parklane Defendants were unaware of the latent defect, (v) upon learning of the latent defect, the Parklane Defendants immediately engaged Young Elevators to repair it, and (vi) after obtaining from IDOPL a 60-day extension of the repair deadline, Young Elevators completed the repair by July 2025. *See* Section III.B.2 at 31-32. Accordingly, as it relates to the elevator, Parklane Defendants did violate a common law duty of reasonable care and Claim 6 cannot proceed on this basis.

### b. Duty Not to Discriminate Based on Handicap

Plaintiff provides no authority – in the context of a negligence claim – recognizing a duty of care to operate a premises free from disability discrimination and to comply with fair housing laws. And the Court has found none. That is unsurprising. Instead, as Parklane Defendants argue, the FHA provides the relevant statutory basis to redress discrimination in the provision of rental housing. *See* Parklane Defs.' MSJ at 27 (Dkt. 50-1). Significantly, Plaintiff fails to address this issue in his Response. *See* Pl.'s Comb. Resp. to Defs.' MSJ at 16-17 (Dkt. 60).

Even if Plaintiff could identify authority establishing a duty to comply with fair housing laws for the purpose of a negligence claim, Parklane Defendants did not breach that duty here.

As discussed *supra,* Parklane Defendants did not act with discriminatory intent or policy or deny Plaintiff a reasonable accommodation under the FHA (Claim 1); nor did they take adverse action to interfere with his request for a reasonable accommodation under the FHA (Claim 2). *See* Sections III.B. & C at 27-37.

Accordingly, Plaintiff has failed to make a sufficient showing as to the essential elements of duty of care and breach as to this theory. *Celotex,* 477 U.S. at 322. Claim 6 cannot proceed on this basis.

### c.    *Duty to Operate Premises in Safe and Habitable Manner*

Plaintiff's final basis for Claim 6 is that Defendants violated their duty to operate the leased premises in a safe and habitable manner, specifically by forcing him to use the freight lift. Pl.'s Resp. to Parklane Defs.' MPSJ at 15. This duty derives from common law (a landlord must exercise reasonable care under the circumstances for the protection of his residential tenant) and statute (under Section 6–320, a landlord must maintain the premises in a manner that is not hazardous to the health or safety of the tenant). *Jesse,* 149 Idaho at 75. For the reasons set forth below, the Court finds that there is a genuine dispute of material fact as to whether Parklane Defendants breached this duty.

From December 2019 (the execution of the Settlement Agreement) through early March 2023 (when Plaintiff vacated the Idanha), Parklane Defendants substantially maintained the Idanha premises – including the elevator and wheelchair lift – in a safe and habitable state. However, there were sporadic outages of the elevator from 2020 through 2022. And from January 1, 2023 through early March, there was an extended outage of the wheelchair lift.

During these outages, Plaintiff could only access his apartment by using the freight lift (to move to and from street level and the basement where the main elevator stopped). On the

occasions from December 2019 through March 2023 that Plaintiff used the freight elevator to access his apartment – with the knowledge and assistance of Parklane Defendants – Parklane Defendants (as landlord) exposed Plaintiff (their tenant) to a hazardous condition.  Namely, Parklane Defendants exposed Plaintiff to a conveyor that was unintended and arguably unsafe for transport of human passengers.  Thus, there is a genuine dispute of material fact as to whether Parklane Defendants breached their common law duty to exercise reasonable care to protect their residential tenant, and as set forth *supra* in Section III.D.2., their statutory duty under Section 6– 320 to maintain the premises in a manner that is not hazardous to the health or safety of the tenant. *Jesse,* 149 Idaho at 75.

Parklane Defendants raise the issue of Plaintiff's consent to using the freight lift. Parklane Defs.' Reply to MPSJ at 10 (Dkt. 66).  Prior to February 3, 2023, when Plaintiff made his first unequivocal request to relocate to a hotel, Plaintiff arguably consented to using the freight lift.[21]  This implicates Idaho's comparative negligence statute which precludes a plaintiff from recovering damages if he is more than 50 percent at fault.  I.C. § 6-801 ("Contributory negligence or comparative responsibility shall not bar recovery . . .  if such negligence or comparative responsibility was not as great as the negligence, gross negligence or comparative responsibility of the person against whom recovery is sought . . . .").  Conversely, when Parklane Defendants unequivocally denied Plaintiff's February 3, 2023 request, they left Plaintiff with no choice but to use the freight lift if he wanted to access his apartment.  Whether, and to what

---

[21] Before February 3, 2023, Plaintiff had the option of unequivocally requesting relocation to a hotel – or even just using the preloaded debit card for that purpose without a prior request – and avoiding the hazard of using the freight lift.  Instead, prior to February 3, 2023, he chose not to invoke this remedy.  *See* Selene Depo. at 130:16-22 ("Again calling a hotel is one of the last resorts for me because it's a lot of work.").

extent, Plaintiff consented – and its effect on his negligence claim – are genuine disputes of material fact that the Court will not resolve here.

Finally, Parklane Defendants argue Plaintiff cannot show recoverable damages, and thus, cannot sustain his negligence claim.  Parklane Defs.' Mem. in Sup. of MPSJ at 25-26 (Dkt. 49-1).  In particular, Parklane Defendants argue that Plaintiff must allege and prove physical injury and has not done so here.  *Id.*  This argument has some merit.

In Idaho, courts require a plaintiff to prove either physical injury or the physical manifestation of severe emotional distress to sustain the damages element.  *See Johnson v. McPhee*, 210 P.3d 563, 574 (Idaho Ct. App. 2009).  The physical manifestation requirement, however, is construed somewhat broadly.  Idaho courts have recognized symptoms such as headaches, insomnia, stomach pain, fatigue, loss of appetite, and similar objectively verifiable conditions as sufficient evidence of physical manifestation.  *See Czaplicki v. Gooding Joint School Dist. No. 231*, 775 P.2d 640 (1989); *Walker v. City of Pocatello*, 2018 WL 650417, at *13 (D. Idaho 2018) (rev'd and remanded on other grounds).

Here, Plaintiff alleges in his Amended Complaint that he suffered physical illness and harm and emotional distress as a result of Parklane Defendants' alleged negligence.  Am. Compl. at ¶¶ 301-03.  While he provides no direct record evidence of physical injury, Plaintiff has provided some (albeit scant) record evidence in support of the physical manifestation of his alleged emotional distress.  In his deposition, Plaintiff testified that he suffers from stress, anxiety and depression that was exacerbated by Parklane Defendants' conduct and has sought counseling therefor.  Selene Depo. at 259:23-260:11 (Dkt. 48-5).  Moreover, Plaintiff testified that he suffers stomachaches and a loss of appetite associated with his depression.  *Id.* at 260:23-261:14.  Finally, Plaintiff declared that he suffers from nightmares, including nightmares about

56

being trapped in the freight lift.  Selene Decl. at ¶ 63.  Accordingly, Plaintiff has presented just enough evidence to create a genuine dispute of material fact on damages.

Accordingly, Claim 6 will proceed to trial on the sole theory of Parklane Defendants' alleged breach of their duty to operate the leased premises in a safe and habitable manner, in relation to Plaintiff's use of the freight lift.

## IV.    THREE ENTITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Three Entity Defendants – Parklane Idanha Associates, LLC, ABC Howell, LLC, and Rental Housing, LLC – move for summary judgment on all claims asserted against them: (i) Claim 1: discrimination under the FHA, (ii) Claim 2: interference under the FHA, (iii) Claim 4: breach of contract, (iv) Claim 5: violation of the ICPA, and (v) Claim 6: negligence.  *See* Three Entity Defs.' MSJ (Dkt. 50).  Generally, the Three Entity Defendants argue that they had no substantive participation in the events underlying Plaintiff's lawsuit, and that the claims against them should therefore be dismissed.  *See* Three Entity Defs.' Mem. in Sup. of MSJ at 3-4 (Dkt. 50-1).

Plaintiff responds that all Defendants – including the Three Entity Defendants – were parties to the Settlement Agreement.  Pl.'s Comb. Resp. to Defs.' MSJ at 17 (Dkt. 60).  Thus, he claims that they are liable for the alleged breach of that agreement.  *Id.* at 16.  Further, he claims that they are liable as "housing providers" under the FHA, and as "sellers" and "persons" under the ICPA.  *Id.* at 17-19.  In his response, however, Plaintiff does not address the application of the negligence claim to the Three Entity Defendants.  *See id.*

Because the Court has granted summary judgment as to Claims 1 and 2 involving the FHA, and Claim 5 involving the ICPA, Plaintiff's arguments as to these counts are moot.  As to

the Three Entity Defendants, the Court addresses the breach of contract and negligence claims below.

### A.    <u>**Breach of Contract**</u>

As set forth *supra* in Section III.E.1., under Idaho law, a breach of contract claim has four elements: (1) the existence of a contract, (2) the breach of that contract, (3) damages resulting from the breach, and (4) the amount of damages. *Mosell,* 154 Idaho at 278.  Critically, a breach of contract claim requires that "the defendant engaged in conduct that violated the contract and caused damages." *Elemental Research Inc.*, 2025 WL 2508380, at *5.

Here, apart from being signatories to the Settlement Agreement, Plaintiff has provided no record evidence that the Three Entity Defendants engaged in any conduct that violated the Settlement Agreement or caused damages.  Indeed, as the Three Entity Defendants argue, they: (i) do not own or manage the Idanha, (ii) were not parties to Plaintiff's lease, (iii) had no dealings with tenants and do not make decisions related to tenants, (iv) did not make any of the decisions regarding the wheelchair lift or elevator at the Idanha or Plaintiff's accommodations, (v) had no responsibility to make such decisions because they do not own or manage the Idanha, and (vi) exercised no control over the decision makers for Idanha Associates, LLC and Parklane Management Company, LLC.  Plaintiff provides no record evidence otherwise.  Thus, Plaintiff has failed to make a sufficient showing to establish the essential elements of breach of contract as to the Three Entity Defendants, and as to them, Claim 4 will be dismissed.

### B.    <u>**Negligence**</u>

For similar reasons, Claim 6 will be dismissed as to the Three Entity Defendants.  As set forth *supra* in Section III.G.1., a common-law action for negligence requires the Plaintiff to prove: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of

conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Oswald*, 167 Idaho at 550.  Again, as set forth above, Plaintiff has provided no record evidence that the Three Entity Defendants – as corporate entities that did not own or control the Idanha – owed Plaintiff a duty of care to maintain the premises in a safe and habitable way, or engaged in any conduct that breached that duty.  Thus, Plaintiff has failed to make a sufficient showing to establish the essential elements of negligence as to the Three Entity Defendants, and as to them, Claim 6 will be dismissed.

## V.    PLAINTIFF'S MOTION FOR PUNITIVE DAMAGES

Plaintiff moves for leave to seek punitive damages as to all claims except for Claim 3 (Section 6-320 violation).  *See* Pl.'s Mtn. for Punitive Damages (Dkt. 47).  As set forth above, only Claim 3 (Section 6-320 violation), Claim 4 (breach of contract) and Claim 6 (negligence) remain, and only as to the Parklane Defendants.  Thus, the Court considers Plaintiff's motion for punitive damages only as to those claims and those Defendants.

In his motion, Plaintiff requests leave to amend or refile his Amended Complaint to include a prayer for punitive damages.  *See* Pl.'s Mem. in Sup. of Mtn. for Punitive Damages at 1 (Dkt. 47-1).  Plaintiff argues that the Court should grant is his motion because Defendants' conduct was "oppressive, fraudulent, malicious, or outrageous." *Id.* at 5-6.  In support, Plaintiff repeats many of the allegations underlying his claims, namely that Defendants (i) repeatedly refused to honor the remedy provision of the Settlement Agreement, thereby trapping him in his apartment, (ii) failed to timely repair the wheelchair lift, requiring him to use a hazardous freight lift to access his apartment; (iii) engaging in an petty and unnecessary squabble with BCACHA and (iv) misrepresenting the safety of the elevator, which failed inspection in March 2025. *Id.* at 6-9.

59

In response, Defendants deny that any of their actions were motivated by a bad intent. Defs.' Resp. to Pl.'s Mot. for Punitive Damages at 9 (Dkt. 58).  Further, Defendants argue that its conduct was not oppressive, fraudulent, malicious, or outrageous, but rather, reasonable under the particular facts and circumstances of this case.  *Id.* at 10-18.  In doing so, Defendants distinguish their conduct (relevant under the standard) from the hardship endured by Plaintiff as a result (not relevant under the standard).  *Id.* at 15.

A.      **Legal Standard**

The remaining claims in this case are state law claims; thus, Plaintiff's instant motion is exclusively governed by Idaho law.  Punitive damages "are not favored in Idaho and therefore should be awarded only in the most unusual and compelling circumstances."  Akers v. D.L. White Const., Inc., 156 Idaho 37, 53 (2014) (quoting *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 904-05 (1983)).  Moreover, while Idaho courts disfavor punitive damages in "routine" breach of contract claims, there is no blanket prohibition against them.  *Thurston Enters., Inc. v. Safeguard Bus. Sys., Inc.*, 164 Idaho 709, 725 (2018).

A claim for punitive damages requires a showing of "oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted."  I.C. § 6-1604(1).  To prove oppressive, fraudulent, malicious or outrageous conduct, the plaintiff must establish, by clear and convincing evidence, "an intersection of two factors: a bad act and a bad state of mind."  *Hall v. Farmers All. Mut. Ins. Co.*, 145 Idaho 313, 319 (2008).  For purposes of a motion for leave to amend or refile to include a prayer for punitive damages, "the party seeking to add a claim for punitive damages does not need to meet this high burden [of clear and convincing evidence]; rather, the party need only show 'a reasonable likelihood of proving facts

60

at trial sufficient to support an award of punitive damages.'" *Bryant v. Colonial Sur. Co.*, No. 2016 WL 707339, at *3 (D. Idaho Feb. 22, 2016) (citing I.C. § 6–1604(2)).

**B.      Analysis**

### 1.      *Breach of Contract*

Here, as to Claim 4 for breach of contract, the Court finds that there is not a reasonable likelihood that Plaintiff can prove at trial, by clear and convincing evidence, that Parklane Defendants' alleged breach of the Settlement Agreement was oppressive, fraudulent, malicious, or outrageous.  In this regard, the Court focuses on Parklane Defendants' conduct, rather than hardship it caused Plaintiff.

Here, notwithstanding the history that was behind it, the Settlement Agreement was a routine contract for which punitive damages are disfavored.  *See Thurston Enters., Inc.*, 164 Idaho at 725.  And Parklane Defendants' conduct in allegedly breaching it was not egregious. Even if ultimately unsupported, Parklane Defendants' position that the remedy provision of the Settlement Agreement was ambiguous as to whether it applied to prolonged outages, and that Plaintiff was not unable to access his apartment so as to trigger the remedy provision, were not patently unreasonable.  And while Parklane Defendants denied the remedy, they simultaneously offered and ultimately provided Plaintiff with a reasonable accommodation – a larger two-bedroom apartment – at their cost.  Under the circumstances, Plaintiff is not reasonably likely to prove, by clear and convincing evidence, that Parklane Defendants' alleged breach was oppressive, fraudulent, malicious, or outrageous.

### 2.      *Negligence*

Likewise, as to Claim 6 for negligence, the Court finds that there is not a reasonable likelihood that Plaintiff can prove at trial, by clear and convincing evidence, that Parklane

61

Defendants' alleged breach of their duty of care to operate the leased premises in a safe and habitable manner was oppressive, fraudulent, malicious, or outrageous. At the outset, the Court does not attempt to defend Parklane Defendants' conduct – post February 3, 2023 – in forcing Plaintiff to use a freight lift, unintended and arguably unsafe for transport of human passengers, to access his apartment where a safer option was available. *See supra* Section III.G.2.c. Arguably, this conduct was outrageous and oppressive. But even so, the Court finds that Parklane Defendants did not undertake it with a bad state of mind. *See Hall*, 145 Idaho at 319.

However dangerous or demeaning, prior to February 3, 2023, Plaintiff previously voluntarily chose to use the freight lift to access his apartment during conveyor outages. *See, e.g.,* Frey Depo. at 73:14-76:4. And, at his request, Parklane Defendants helped him. Plaintiff would call a Parklane maintenance employee – who was on call to assist Plaintiff – and request assistance. *Id.* The maintenance employee would respond and help Plaintiff operate the freight lift. *Id.*

After February 3, 2023, Parklane Defendants forced Plaintiff to use the freight lift. Again, however, they simultaneously engaged with him on reasonable accommodations. And ultimately, they provided him with a larger two-bedroom apartment at their cost.

Because Parklane Defendants assisted Plaintiff in using the freight lift when he voluntarily requested it, and found him a reasonable accommodation after he was forced to use it, the Court finds that Plaintiff is not reasonably likely to prove at trial, by clear and convincing evidence, that Parklane Defendants acted with a bad intent. Thus, Parklane Defendants' alleged breach of their duty of care was not oppressive, fraudulent, malicious, or outrageous.

Accordingly, for all remaining claims and Defendants in this matter, there is no basis for punitive damages. Plaintiff's motion will be denied.

62

## VI.    SUPPLEMENTAL JURISDICTION

Having dismissed Plaintiff's federal claims under the FHA as to all defendants, the Court raises a question *sua sponte*: whether it should retain jurisdiction over Plaintiff's remaining state law claims.

Plaintiff filed this case in federal court pursuant to 28 U.S.C. § 1331, because his federal claims under the FHA "arose under" the laws of the United States.  *See* Am. Compl. at ¶ 1.  The Court exercised supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, which allows federal courts to hear additional state law claims when they are related to federal claims and arise out of a common nucleus of related facts, thereby forming a single case or controversy.  *See* 28 U.S.C. § 1367(a); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

However, when a federal court "has dismissed all claims over which it has original jurisdiction," it may "decline to exercise supplemental jurisdiction" over state claims.  28 U.S.C. § 1367(c)(3).  The decision whether to retain or reject jurisdiction over these standalone state claims is within the court's discretion.  *Pell v. Nunez*, 99 F.4th 1128, 1135 (9th Cir. 2024).  In exercising that discretion, the court must balance values of judicial economy, convenience, fairness, and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Here, the Court will exercise its discretion to retain jurisdiction over Plaintiff's state law claims.  Both judicial economy and comity weigh in favor of this decision.  Here, the relatively advanced stage of the case, combined with Court's familiarity with its facts, means that judicial economy weighs in favor of retaining jurisdiction.  Further, Plaintiff's remaining state law claims, at this stage, raise no particularly novel state law issues whose resolution would infringe on principles of state and federal comity.

## VII.    CONCLUSION

The Court orders as follows:

1.    Defendants' Motion *in Limine* (Dkt. 53) is GRANTED in part and DENIED in part, without prejudice.

2.    The parties' Cross Motions for Partial Summary Judgment (Dkts. 48 & 49) are each GRANTED in part and DENIED in part:

    a.    Claim 1 (FHA discrimination): Parklane Defendants' motion is GRANTED. Plaintiff's motion is DENIED.  Claim 1 is dismissed with prejudice.

    b.    Claim 2 (FHA interference): Parklane Defendants' motion is GRANTED. Plaintiff's motion is DENIED.  Claim 2 is dismissed with prejudice.

    c.    Claim 3 (breach of contract): Plaintiff's motion is DENIED.  Claim 3 will proceed to trial.

    d.    Claim 4 (Section 6-320): Parklane Defendants' motion is DENIED.  Claim 4 will proceed to trial.

    e.    Claim 5 (violation of ICPA): Parklane Defendants' motion is GRANTED. Plaintiff's motion is DENIED.  Claim 5 is dismissed with prejudice.

    f.    Claim 6 (negligence): Parklane Defendants' motion is GRANTED in part and DENIED in part.  Claim 6 will proceed to trial.

3.    Three Entity Defendants' Motion for Summary Judgment (Dkt. 50) is GRANTED.

    a.    All claims as to the Three Entity Defendants are dismissed with prejudice.

4.    Plaintiff's Motion for Leave to Seek Punitive Damages (Dkt. 47) is DENIED.

5.    The Court retains supplemental jurisdiction over the remaining state law claims.

IT IS SO ORDERED.



DATED:  July 7, 2026

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge